STATE

v.

Bruce L. **UPHAM.**

No. 79–128–C.A.

Supreme Court of Rhode Island.

June 9, 1980.

Dennis J. Roberts, II, Atty. Gen., Susan E. McGuirl, Sp. Asst. Atty. Gen., for plaintiff.

Stone, Clifton & Clifton, Edward C. Clifton, Providence, for defendant.

OPINION

KELLEHER, Justice.

At approximately 2:45 a. m. on July 1, 1977, Middletown police officer Paul D. Preuit responded to a call that had emanated from a house located somewhere along Purgatory Road. The caller was a forty-year-old woman who reported to the police that she had been raped by an intruder who had broken into her home. In due course, the defendant, Bruce L. Upham (Upham), was arrested, indicted, and convicted of committing the crimes of rape, sodomy, burglary, and assault with a dangerous weapon.

In his appeal Upham challenges the trial justice's denial of his motion to suppress both the out-of-court and in-court identification made of him by the complainant. Upham also claims that the trial justice's imposition of a life sentence on the rape charge—which would not begin to run until Upham had served the term sentences imposed on the other three charges—was such an abuse of judicial discretion as to amount to cruel and unusual punishment.

The identification issue necessitates a brief narration of the facts adduced at trial. For the purposes of preserving the complainant's anonymity as well as the reada-

bility of this opinion, we shall refer to the complainant as "Jane."

During the early evening of June 30, 1977, Jane and a male friend saw a play at the Lederer Theatre in Providence. At the conclusion of the play Jane, who was in her friend's car, drove her friend to his Newport home. There she picked up her own automobile and drove to Middletown. As Jane arrived at her Middletown residence, the moon was full, and the hour was approximately 11:40 p. m. After checking to see that the doors were locked, she went to bed in her second-floor bedroom. Jane was alone in the house. Her two young sons were spending the night with their father[1] in New Jersey because the older boy was about to undergo eye surgery in Philadelphia.

Jane's fear of the dark caused her to leave three lights burning throughout the night. Two were to be found on the first floor: one was in the kitchen, and the other illuminated the living-room area. The third was upstairs in the bathroom. Each light consisted of a sixty-watt bulb. The bathroom door was ajar so that the illumination came out into the corridor. Jane's bedroom was directly across the corridor.

Like many Americans, Jane watched "a little bit of the Johnny Carson show" before going to sleep. She was asleep at approximately ten minutes after midnight. A noise that sounded like a flapping of a window shade awakened Jane. A glance at her bedside clock indicated that the time was 1:43 a. m. She sat up in bed and put on her glasses. As she looked toward her doorway, she saw a naked foot and the profile of a face that seemed to be peering at her. When Jane questioned the purpose of the unannounced visit, a male voice responded, "I'll show you," and the intruder walked toward her.

When he arrived at the bedside, a struggle ensued. During this encounter Jane's glasses fell off. When she reached for the phone, the intruder pulled the receiver and its cord out of the cradle of the telephone. Jane's flannel nightgown was removed. The intruder then grabbed Jane by the wrist and dragged her down the stairs to the first floor. His ultimate destination was apparently the beach that runs alongside Jane's home.

When Jane reached the first floor, she attempted to break away from the intruder and headed for the front door, believing that this was the intruder's point of entry. When she reached the front door, it was still bolted. The burglar countered her attempt to unlock it by striking her in the face. He then pulled Jane by her wrists into the kitchen where he was momentarily distracted because he was rummaging through the cabinets and drawers. Jane, therefore, attempted to use the kitchen phone, but her attempt proved useless because somehow the ripped-out bedroom receiver cord made the downstairs phone inoperative. Upham eventually located a steak knife and held it to her throat.

Jane was taken outside to the beach. After a few minutes she convinced her attacker that it might be in his best interest to return to the house because of the possibility that inquisitive neighbors might observe what was going on.[2] They returned to the second floor and spent some time in the children's bedroom and in the illuminated bathroom. Jane was then taken outside to that part of the yard that is situated between the back of her house and the side of Purgatory Road.[3] When she reached this location, she once again tried to escape, but her assailant grabbed her and put the knife to her side. This time he dragged her back into the living room and ordered her to turn

---

1. In June of 1977 Jane and her husband were separated, and at trial time they had been divorced.

2. At trial Jane testified that her effort to stage a retreat to the house stemmed from her fear that a rescue from the beach would be highly improbable because of the noise of the surf.

3. Jane's home fronts on the shoreline. Hence, her front door is on the beach side, while the back door is located at the Purgatory Road side of her property.

off the lights. Finally, Jane was told to go upstairs to her bedroom, close the door, and call no one. Jane headed for the bedroom. When she arrived there, she found and put on her glasses. She reassembled the bedside phone and called the police. When she checked the bedside clock, it indicated that the time was 2:45 a. m.

We have no intention of detailing the numerous indignities to which Jane was subjected during the sixty-two minutes she was in the company of her attacker, but suffice it to say that she was forced to be an unwilling participant in repeated episodes of vaginal intercourse, oral intercourse, and unsuccessful attempts by the attacker at anal intercourse. Photographs taken of Jane's face and of the bedroom and kitchen areas of her house are graphic, compelling evidence of what must have been a most terrifying and degrading experience.

After Jane had been treated at Newport Hospital's emergency room, she was transported to the Middletown Police Station where she saw some "mug books." It was now about 5 a. m. and at this time she made a tentative identification. She returned to the station at approximately 1:30 p. m. and there viewed another set of pictures. At that time Jane identified Upham as her assailant.

Upham presented an alibi defense. June 30 was a Thursday and marked the beginning of 1977's Fourth of July weekend. Many of Upham's relatives testified that at the time Jane was being confronted, pursued and assaulted in Middletown, he was a hundred miles away, celebrating the anniversary of our nation's independence with his parents at their home in Petersham, Massachusetts. Upham's suppression motion was based on his contention that the techniques used by the Middletown police at the 5 a. m. viewing session with Jane violated his due-process rights because the techniques were impermissibly suggestive. We do not agree.

The "mug book" first presented to Jane was a large three-ring binder which, according to Jane, "had many pages in it and many pictures on each page." The pictures were in color, and each page contained four pictures. Jane examined all the photographs and reported that she did not see the intruder. One of the officers then took the book, left the room, and substituted a mug shot of Upham for one of the other photos. He returned to the viewing table, opened the book to two pages of pictures, and told Jane that somewhere on those pages was a picture of the man that the police suspected might be the intruder. Jane was asked to try to pick out the suspect. She looked at all eight pictures and finally pointed to Upham's picture and said, "This is the only one on these two pages that it could have been." Upham now claims, as he did before the trial justice, that the addition of his mug shot by the police together with their remarks were so unfairly suggestive that they tainted both Jane's police-station and in-court identification of him.

The simple response to this contention is that while the Middletown police might have attempted to be suggestive, Jane never accepted the suggestion. She made it very clear to the police and to the trial justice that her early-morning identification was strictly tentative. She was not sure that the substitute photo showed the man who had broken into her home three hours earlier. The photo she saw showed a clean-shaven individual standing with the upper part of his body, including his head, directly facing the camera. Her doubts were engendered by her observation that the subject's appearance differed in several respects from that of her attacker, such as a different hair style and no moustache. She also expressed concern about the photo's failure to present the subject's facial profile, especially the features of his nose and jaw. Jane told the trial justice that her goal in looking at the photos was to pick out a man who looked exactly like the one "who had been in my house."

When Jane returned to the station for the afternoon showing, the police presented

her with a dozen photo strips.[4] Each strip portrayed in black and white, a Caucasian subject in two poses: full face to the camera and profile. All individuals pictured wore moustaches and there was a striking similarity of hair style, but Jane had no hesitation whatsoever about picking out Upham. She testified that her afternoon identification was not based in any way on the photo shown to her earlier that day.

We have examined the photos of Upham that were viewed by Jane, and one need not be an expert to see that the color portrait shows an individual whose appearance is substantially dissimilar to the individual selected by Jane following her inspection of the dozen picture strips. Also introduced into evidence was a picture taken of Upham at the time of his arrest on July 5, 1977. This picture, which differs substantially from the other two pictures, graphically demonstrates the ineptness of the suggestive approach taken by the police, if that was their purpose, and the visual perspicacity of Jane as she conscientiously attempted to identify the intruder who had entered her property.

Obviously, there is no merit to Upham's complaint about the suggestive police practices, and the record amply demonstrates that Jane's in-court identification had a source that was completely independent of the so-called suggestive mug shots. Jane explained that she needed glasses because she was nearsighted. The glasses enable her to see distant objects clearly. At the suppression hearing, the trial justice, therefore, tested Jane's visual acuity. He removed her glasses and had her read a portion of Upham's motion for discovery. After Jane had read a portion of Upham's motion, defense counsel agreed that with her glasses off Jane could read "somewhere between 15 and 18 inches from her face." [5] The record makes it clear that for a greater part of the hour that Jane and her attacker were together at various locations on Jane's real estate, they were but inches apart

while facing each other. The illumination during this period was furnished by the lamp in the kitchen, the lamp in the living room, the light in the bathroom, and the full moon whose beams showered the beach and the yard with light.

██ In denying Upham's motion for a new trial, the trial justice stated that he was impressed by the calm and collected manner in which Jane conducted herself while the intruder was in her house. This woman, he said, was "well possessed of her faculties despite the ordeal that she was undergoing." We share these sentiments. An examination of the record clearly indicates that Jane kept her emotions in check even though undergoing a horrifying hour so that she could at a later time assist the police in apprehending her assailant. We find no merit to Upham's complaint about Jane's identification of him as the owner of that bare foot that appeared outside of her bedroom door at 1:43 a. m. on July 1, 1977.

The sentence aspect of Upham's appeal needs little discussion. The trial justice imposed a twenty-year sentence on the sodomy conviction, a five-year sentence on the burglary conviction, and a ten-year sentence on the assault-with-a-dangerous-weapon conviction. All of these sentences were to run concurrently. He then imposed a life sentence on the rape count and specifically said that the life sentence was to be consecutive rather than concurrent. In taking this tack, the trial justice made it clear that he was dissatisfied with the parole statute that specifies that a person serving a life sentence may be eligible for parole after ten years.

While Upham describes his punishment as being cruel and unusual, he actually claims that the trial justice's power to impose a consecutive sentence or sentences is restricted to those instances where the defendant, at the time of imposition, is already serving a prison sentence. Upham

---

4. The strips are exhibits.

5. At the trial, during cross-examination Jane estimated that without her glasses she could

see a distance of "about two feet * * * clearly in the dim light in my home."

bases this claim upon the pertinent language of G.L. 1956 (1969 Reenactment) § 12–19–5, which reads:

"Whenever any person shall be convicted of any offense punishable by imprisonment, such person being at the time under sentence of imprisonment on a former conviction, the court passing such subsequent sentence may sentence such person to the term of imprisonment provided by law, to commence at the expiration of the term of imprisonment under the former sentence or sentences."

He also describes § 12–19–5 as the keystone of the parole system established by the General Assembly, safeguarding by its presence that portion of § 13–8–13 (1979 Supp.) whereby the parole board "may" parole a "lifer" who has served ten years of the life sentence.

We would point out that the exact language found in § 12–19–5 seems to have first made its appearance in Rhode Island statute books back in 1857. *See* P.L. 1857, ch. 222, § 38. Thus, this statute preceded the establishment of the parole board by over half a century because the board and the parole system did not arrive on the scene until 1915 with the passage of P.L. 1915, ch. 1186.

We also believe that Upham misconstrues the thrust of § 12–19–5. His misconception is understandable because of what was said in *Mancini v. Langlois*, 101 R.I. 387, 224 A.2d 47 (1966). There, Mancini was being detained at the Adult Correctional Institutions while the parole board was considering the question of revoking his parole because, after being paroled, he had been arrested and charged with breaking and entering. While the board had this matter under consideration, Mancini was taken to the Superior Court, where he received a five-year sentence for having violated the terms of his deferred-sentence agreement. The sentencing judge, in imposing sentence, said the five years was " 'to begin upon the expiration of the sentence for which he is now on parole.' " *Id.* at 388, 224 A.2d at 48. Thereafter, the parole board revoked Mancini's parole. Several years later, at Manci-

ni's request, the board rescinded the revocation. The vote of rescission stated that Mancini was " 'To Start Serving New Sentence, which was to be consecutive to this Viol. [violation] time.' " *Id.* at 389, 224 A.2d at 48.

Mancini in his habeas petition claimed that the uncertainty about when the five-year sentence began cast a cloud on his exact status at the prison and that this uncertainty regarding the starting date voided the sentence. We rejected Mancini's argument with respect to voidance and observed that while there might be some uncertainty about when the five-year sentence began, there was no uncertainty concerning the length of that sentence. In the opinion, we alluded to Mancini's concession that "a court in this state may under § 12–19–5 impose a sentence to commence upon the expiration of a term of imprisonment then being served." *Id.*

■ The right to impose consecutive sentences was well recognized at common law. *State v. Mahaney*, 73 N.J.L. 53, 62 A. 265 (Sup.Ct. 1905), *aff'd* 74 N.J.L. 849, 67 A. 1103 (E. & A. 1907). It is our belief that § 12–19–5 is but a codification of the common law.

■ With all due respect to Mancini's concession, there is absolutely no requirement in § 12–19–5 that a defendant be actually serving a sentence before the consecutive sentence proviso becomes operative. While the language of 1857 might stand a bit of updating, in essence the statute provides that whenever an individual appears before a judge for sentencing after having been convicted for an offense punishable by imprisonment, and such an individual "being at the time under sentence of imprisonment on a former [or another] conviction," the judge imposing the second sentence "may sentence" such an individual to a term that will commence at the expiration of the "former sentence or sentences." General Laws 1956 (1969 Reenactment) § 12–19–5.

■ When Upham appeared for sentencing, he then stood convicted of four sepa-

rate crimes: rape, sodomy, burglary, and assault with a dangerous weapon. After the trial justice affirmed the convictions by his denial of the motion for new trial, he imposed the sodomy sentence, the burglary sentence, and the assault-with-a-dangerous-weapon sentence, all in that order, and then imposed the rape sentence last. Placing these actions within the context of the language of § 12–19–5, it is obvious that at the time of the imposition of the consecutive sentence for rape, sentences had already been pronounced on the other three convictions. Upham was, therefore, certainly "under sentence" within the meaning of § 12–19–5 when the consecutive life sentence was imposed. Thus, the length of the sentences and their method of imposition were authorized by the various pertinent statutes, and Upham's so-called cruel-and-unusual-punishment argument must fall by the wayside.

The defendant's appeal is denied and dismissed, the judgment of conviction appealed from is affirmed, and the case is remanded to the Superior Court.