## STATE

v.

## Samuel FUENTES.

### No. 79–132–C.A.

Supreme Court of Rhode Island.

Aug. 3, 1981.

---

Dennis J. Roberts II, Atty. Gen., Thomas H. Caruolo, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Paula Rosin, Asst. Public Defender, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

This is an appeal from judgments of conviction by the defendant, Samuel Fuentes, who was tried before a justice of the Superior Court, sitting with a jury, on an indictment charging him with the murders of Helen and Jane Dias. Prior to trial, the defendant moved to suppress a confession and certain other evidence allegedly obtained in violation of his constitutional rights. The trial justice denied this motion. The jury found the defendant guilty of murder in the first degree on both counts of the indictment. The defendant was sentenced to two consecutive life terms.

The record discloses that Helen Dias and her daughter Jane resided in a basement apartment on Quince Street in Providence, Rhode Island. On February 24, 1978, Marta Carlos, a close friend and neighbor of the Diases filed a report with the Providence police that she had not seen and could not locate Helen Dias or her daughter. Shortly thereafter, on March 1, 1978, Irene Sanford, another close friend of the Diases, filed a "missing persons" report with the Providence police department relative to the disappearances of Helen and Jane Dias. As a result of these reports, Detectives Stephen Springer and William Mitchell of the Providence police department commenced an investigation into the disappearances of Helen and Jane Dias.

The investigation by Detectives Springer and Mitchell disclosed that on February 21, 1978, Jane Dias engaged in an argument with defendant at a neighborhood food market. Through the testimony of Marta Carlos, who had accompanied Jane to the market, the detectives discovered that defendant had been the boy friend of Jane Dias and that she had told defendant at that time that she did not want to see him any more. Also present at the time was another neighbor and friend of the Diases, Berta Ledo. Before leaving the food market, Jane Dias expressed a concern to her friends for her personal safety because of the argument she had with defendant.

Later that evening, Jane Dias and Marta Carlos borrowed an automobile and went out for a short ride. Upon their return to Quince Street, Jane Dias observed an automobile belonging to defendant parked near a building directly across from the backyard of her apartment. Fearing for her safety, Jane requested that she be driven to a nearby drugstore, where she phoned her mother at the apartment.[1] There being no answer, she then, accompanied by Marta Carlos, returned to her Quince Street apartment by various circuitous routes. According to Marta Carlos, Jane entered her base-

ment apartment sometime after 8 p.m. on February 21, 1978. This was the last time Jane was seen alive by anyone other than her murderer.

On the evening of March 2, 1978, as a result of their continuing investigation, Detectives Springer and Mitchell went to defendant's home in Pawtucket to question him about the disappearances of Helen and Jane. The detectives, however, found no one at the Pawtucket address. Detective Mitchell then phoned John Ruginski (Ruginski), an attorney who had represented defendant in the past, and inquired if he had seen defendant. Ruginski told them that he had seen defendant in the Providence Superior Court earlier that day. Detective Mitchell than asked Ruginski if he could locate defendant and have him come down to the police station for questioning concerning the whereabouts of Helen and Jane. Ruginski then asked Detective Mitchell if defendant was suspected of any wrongdoing. Mitchell responded that defendant was not a suspect but was wanted for questioning concerning the Diases' disappearance. Ruginski then informed Mitchell that he had already discussed the Diases' disappearance with defendant and that defendant had stated that he had no knowledge of their whereabouts. Furthermore, Ruginski told Detective Mitchell that in the event he located defendant, he would present him at the police station to discuss the matter.

On the morning of March 3, 1978, defendant was arrested by the Pawtucket police on a District Court bench warrant issued on February 1, 1978, for failure to pay a fine of $103.50. Upon learning that defendant was in custody, Detectives Mitchell and Springer went to the Pawtucket police station and brought defendant back to the Providence police station for questioning on the Diases' disappearance. According to the police, defendant arrived at the Providence police station at approximately 12 noon. The defendant then was advised of his *Miranda* rights in English from a so-

---

1. The record revealed that defendant had assaulted Jane on a prior occasion and had left her in a junkyard.

called rights form. The defendant was asked whether he understood the rights and whether he wanted a lawyer of his own choosing or an appointed one. According to the police investigators, defendant indicated that he understood his rights, that he did not want an attorney, and that he was willing to make a statement to the police. Thereupon, Detective Springer asked defendant when he last saw Helen and Jane Dias. The defendant, in turn, responded that he had last seen Helen and Jane Dias the night of February 21, 1978, shortly after the argument with Jane in the food market and that he did not know where they now were. Detective Springer then told defendant that he believed defendant "may have done away with [the Diases]." The defendant responded, "You have no proof. You have no corpus delicti." At this point, the interrogation ceased.

On the morning of March 4, 1978, Detectives Mitchell and Springer, along with several other members of the Providence police department, returned to the Diases' apartment on Quince Street. At approximately 1 p.m., the police discovered the bodies of Helen and Jane Dias buried in the dirt floor of a room adjacent to the basement apartment. Upon discovering the bodies, Detective Springer called the Providence police station to ascertain whether or not defendant was still in custody. He was informed that because of a snowstorm on that particular morning, a judge was not available to release defendant and therefore, defendant was still in custody.

Detectives Springer and Mitchell immediately returned to the police station and at approximately 4 p.m. they began interrogating defendant on the disappearance of the Diases. After being informed of his rights for a second time, defendant acknowledged again that he understood them and agreed to make a statement. The defendant then was shown photographs of the bodies of Jane and Helen Dias taken earlier that day. At this point, Detectives Mitchell

and Springer stated that defendant became visibly shaken, and in response to Detective Springer's question "Did you kill them?" the defendant made an oral statement implicating himself in the murders of Jane and Helen Dias.[2] By 6:40 p.m., defendant's admissions were reduced to a six-page typewritten statement.

Before trial, defendant moved to suppress the confession and other evidence obtained therefrom claiming that during the period of custodial interrogation until the time he made the admissions, he was physically abused by various members of the Providence police department and that as a result his confession was coerced and involuntary. Additionally, defendant contended that he was effectively denied the right to counsel.

At the hearing, Detectives Mitchell and Springer, who were in charge of the investigation, testified that at all times they respected the rights of defendant, that the interrogation was conducted in a lawful manner, that defendant had been advised of his rights on at least three occasions, and that defendant had clearly indicated he was aware of his rights. Moreover, they indicated that defendant was not physically abused by any of the officers and that defendant had waived his rights willingly and voluntarily. Finally, the detectives testified that at no time during the questioning by the police did defendant ask for a lawyer.

After hearing and considering the evidence, the trial justice found that the confession was voluntary and that the evidence failed to establish any attorney-client relationship. She also found that defendant did not make any request for an attorney and indeed had waived his right to have counsel present during the interrogation. Thus, on the basis of all the evidence, the trial justice denied defendant's motion.

■ On appeal, we are confronted with the following issues: (1) whether defendant's confession was involuntary, (2) wheth-

---

**2.** Detectives Mitchell and Springer were able to tape-record part of defendant's statement. Because of defendant's crying and sobbing, however, they were unable to complete the tape recording.

er defendant was denied his right to counsel in violation of the Fifth and Sixth Amendments to the United States Constitution, as applied to the states by the Fourteenth Amendment, and art. I, sec. 10 of the Rhode Island Constitution, and (3) whether the trial justice had authority to impose consecutive sentences.[3]

## I

The defendant claims first that his conviction should be reversed because it was based upon an involuntary confession. The defendant testified that he was periodically beaten and physically abused by the police and thus was coerced into making a statement implicating himself in the deaths of Jane and Helen Dias. Furthermore, defendant contends that, because of the coercive pressures created by the police, he did not intelligently and knowingly waive his rights. However, Detectives Mitchell and Springer testified that defendant was not beaten or coerced in any manner, that he made his statement willingly and voluntarily, that he understood and comprehended his rights, and that he had waived his rights knowingly and intelligently.

■ It is undeniably clear that the Fourteenth Amendment forbids the use of involuntary confessions. Any conviction based in whole or in part upon an involuntary confession, regardless of its truth or falsity, deprives a defendant of due process of law and, therefore, the conviction should be reversed. *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908, 915 (1964); *Rogers v. Richmond*, 365 U.S. 534, 543–44, 81 S.Ct. 735, 741, 5 L.Ed.2d 760, 768 (1961); *Spano v. New York*, 360 U.S. 315, 324, 79 S.Ct. 1202, 1208, 3 L.Ed.2d 1265, 1272 (1959). However, neither custody nor questioning of a suspect will serve by itself to invalidate automatically a resultant confession. *Bram v. United States*, 168 U.S. 532, 558, 18 S.Ct. 183, 192–93, 42 L.Ed. 568,

578–79 (1897). Moreover, a confession is not inadmissible when the statements made during the interrogation are truly voluntary. *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966); *State v. Amado*, R.I., 424 A.2d 1057, 1061 (1981).

■ In considering the question of the voluntariness of a confession, a defendant is entitled to an independent hearing. At this hearing, the prosecution must establish the voluntariness of the confession by clear and convincing evidence. *See State v. Amado*, 424 A.2d at 1061; *State v. Espinosa*, 109 R.I. 221, 230, 283 A.2d 465, 469–70 (1971). The test in determining the voluntariness of the confession is whether defendant's statements were "the product of his free and rational choice" and not a product of coercion in any form. *Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77, 80 (1968); *State v. Amado*, 424 A.2d at 1062. This is a question of fact to be decided initially by the trial justice. *See Jackson v. Denno*, 378 U.S. at 377, 84 S.Ct. at 1781, 12 L.Ed.2d at 916; *State v. Bello*, R.I., 417 A.2d 902, 904 (1980); *State v. Boswell*, 73 R.I. 358, 361, 56 A.2d 196, 198 (1947). When deciding the issue of voluntariness, courts examine the conduct of the interrogators as well as the behavior and statements of the defendant. *North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286, 293 (1979); *State v. Amado*, 424 A.2d at 1062. Furthermore, when on appeal a defendant contends that the findings of the trial justice concerning voluntariness were in error, we apply the "clearly erroneous rule." *State v. Amado*, 424 A.2d at 1062; *State v. LaRosa*, 112 R.I. 571, 576, 313 A.2d 375, 377 (1974); *State v. Leavitt*, 103 R.I. 273, 290, 237 A.2d 309, 318, *cert. denied*, 393 U.S. 881, 89 S.Ct. 185, 21 L.Ed.2d 155 (1968). This requirement is met when the reviewing court on the basis of all the evidence is left with the firm conviction that "a mistake has been

---

**3.** The defendant also argues that he was indicted by an illegally constituted grand jury. Because defendant failed to file the requisite motion to challenge the composition of the grand jury prior to trial pursuant to Super.R.Crim. P.

12(b)(2), (3) we find defendant's argument is not properly before this court. *State v. O'Coin*, R.I., 417 A.2d 310, *petition for reargument denied*, R.I., 423 A.2d 1191 (1980).

committed." *State v. LaRosa*, 112 R.I. at 576, 313 A.2d at 377.

In the instant case, the hospital records indicated only that defendant had an "old laceration, right knee" that was "healing nicely"; no statement or other evidence of physical abuse was documented. Furthermore, the photographs taken by Ruginski shortly after the confession and submitted by defendant did not substantiate defendant's claim that he had been repeatedly beaten by a telephone or walkie-talkie, struck by a chair, or dragged up a flight of stairs; in fact, no bruises at all were in evidence.

 From a review of the entire record, we find that the trial justice could reasonably determine that defendant had not been subjected to physical abuse by the police. Whether a confession was voluntary or was a product of duress or coercion is a question of fact to be determined from the totality of the circumstances of the case. In viewing the totality of the circumstances here, we find that there was no improper police conduct in obtaining the confession nor was there any evidence indicating that the confession was involuntary. Accordingly, we hold that the determination by the trial justice that defendant's confession was voluntary was supported by the evidence and was not clearly wrong.

## II

The defendant contends next that an attorney-client relationship existed at the time of his confession and that he effectively was denied his right to the presence of counsel as guaranteed by the Fifth and Sixth Amendments to the United States Constitution and art. I, sec. 10, of the Rhode Island Constitution. Moreover, defendant specifically contends that even though he was advised of his constitutional rights under *Miranda*, because of a language barrier he did not knowingly and intelligently waive his right to counsel.

 In *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the Court indicated that when an investigation begins to focus on the suspect and the police employ processes whose purpose is to elicit incriminating statements, the accused must be afforded his Sixth Amendment right to counsel. *Id.* at 490–91, 84 S.Ct. at 1765, 12 L.Ed.2d at 986. Subsequently, when addressing the Fifth Amendment privilege against compelled self-incrimination, the Court stated that when a suspect is in custody for interrogation purposes, he must be advised that he has a legal right to remain silent and that he may have an attorney present during the interrogation. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). The Court has also stated that the Sixth Amendment right to counsel attaches only "at or after the time that judicial proceedings have been initiated against [an accused]—'whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424, 436 (1977) (*quoting in part Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972)); *see United States v. Wade*, 388 U.S. 218, 224, 87 S.Ct. 1926, 1931, 18 L.Ed.2d 1149, 1156 (1967); *Massiah v. United States*, 377 U.S. 201, 205, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246, 250 (1964). Upon review of the facts in the instant case, we find it is clear that no formal adversarial proceedings had been initiated against defendant, thus, there could have been no violation of defendant's Sixth Amendment right to counsel at the time in question. Therefore, we focus solely on whether defendant was denied his Fifth Amendment right to the presence of counsel during the interrogations and whether he had knowingly and intelligently waived his right to counsel.

In order to consider properly the questions whether there had been an attorney-client relationship at the time the confession was made and whether defendant had waived his right to counsel, it is necessary that we set forth in detail the events that took place prior to the time that defendant made the incriminating statements.

On the evening of March 2, 1978, Detective Mitchell called Attorney Ruginski to inquire if Ruginski had seen defendant. Detective Mitchell informed Ruginski that defendant was not a suspect but that he was wanted for questioning relative to the prolonged absence of Helen and Jane Dias. The defendant claims that this conversation clearly establishes an attorney-client relationship between Ruginski and himself and further that once the police had notice that defendant was represented by counsel, any subsequent interrogation of defendant without informing him of his attorney's availability constituted a denial of his Fifth Amendment right to counsel.

The record indicates, however, that Ruginski did not make it clear to Detective Mitchell that he was representing defendant nor did Ruginski make it clear that defendant was not to be interrogated outside of Ruginski's presence. *Cf. Commonwealth v. McKenna*, 355 Mass. 313, 324, 244 N.E.2d 560, 566 (1969) (attorney specifically requested that he be present at any interrogation); *People v. Garofolo*, 46 N.Y.2d 592, 600, 389 N.E.2d 123, 126, 415 N.Y.S.2d 810, 813 (1979) (attorney must sufficiently identify himself with defendant's interest); *Commonwealth v. Hilliard*, 471 Pa. 318, 323, 370 A.2d 322, 324 (1977) (counsel had expressed a desire to be present during interrogation). Furthermore, for the purposes of determining whether an attorney-client relationship was established in the Diases' matter, it is largely irrelevant that Detective Mitchell knew that defendant had been represented in the past by Ruginski in some unrelated cases. *See People v. Hetherington*, 27 N.Y.2d 242, 245, 265 N.E.2d 530, 531, 317 N.Y.S.2d 1, 2 (1970).

■ As further evidence that no attorney-client relationship had been established by Ruginski's actions, we note that upon learning that defendant was being held at Providence police headquarters, Ruginski again spoke with the police at approximately 3 p.m. on March 4, 1978. The police at this time informed Ruginski that defendant was in custody on a District Court bench warrant, yet Ruginski again failed to make

it clear that he was representing defendant or that defendant should not be questioned outside of his presence. In fact, the trial justice found that at no point in any of the conversations with the Providence police did Ruginski state that "Fuentes is my client. If you pick him up, you're not to question him" or use any other words to the same effect. In view of these facts, we find that there was sufficient evidence to support the trial justice's finding that the attorney's actions and conduct did not establish an attorney-client relationship. Therefore, we cannot say that the trial justice was clearly erroneous in her conclusion.

Finally, defendant claims that he did not knowingly and intelligently waive his *Miranda* rights. Essentially he argues that even though he was read his *Miranda* rights, because of his lack of understanding of the English language he did not comprehend these rights and, therefore, did not intelligently waive them. The defendant adds that he was coerced into executing a waiver-of-rights form.

■ The right to counsel, like most other constitutional rights, may be waived. "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *State v. Amado*, 424 A.2d at 1060 (*quoting Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938)); *Thornley v. Mullen*, 115 R.I. 505, 511, 349 A.2d 158, 161 (1975). However, a waiver of the right to counsel, once invoked, not only must constitute a knowing and intelligent relinquishment of a known right or privilege but also must be voluntary.

■ Recently, the United States Supreme Court has indicated that once an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation * * * until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In reviewing alleged waivers of the right to counsel, we must

examine "the particular facts and circumstances surrounding [the] case including the background, experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. at 374–75, 99 S.Ct. at 1758, 60 L.Ed.2d at 293 (*quoting Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023, 82 L.Ed. at 1466); *State v. Amado*, 424 A.2d at 1061. This test is referred to as the "totality-of-the-circumstances approach." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979). In such a case, the prosecution bears a heavy burden in establishing that an accused waived his privilege against compelled self-incrimination and his right to counsel. *Tague v. Louisiana*, 444 U.S. 469, 471, 100 S.Ct. 652, 653, 62 L.Ed.2d 622, 625 (1980); *North Carolina v. Butler*, 441 U.S. at 373, 99 S.Ct. at 1757, 60 L.Ed.2d at 292; *Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724; *State v. Amado*, 424 A.2d at 1061; *State v. Vargus*, 118 R.I. 113, 122, 373 A.2d 150, 154 (1977). Usually, in the absence of coercive pressures, a court generally will find a waiver if the defendant was informed of his rights, as required by *Miranda*, indicated that he understood them, and then voluntarily made a statement. *State v. Proulx*, R.I., 419 A.2d 835, 839–41 (1980); *State v. Halstead*, R.I., 414 A.2d 1138, 1149–51 (1980); *State v. Arpin*, R.I., 410 A.2d 1340, 1343–45 (1980).

■ The defendant admits that he was informed of his rights as required by *Miranda* but contends he did not understand them. The record indicates instead that defendant attended Rhode Island Junior College for two semesters and responded to questions in English before they were interpreted on several occasions during trial. Furthermore, the record reveals that on more than one occasion, he responded to complicated questions with gestures that indicated that he understood English. Finally, after studying defendant's demeanor and reactions to testimony and after reviewing the tape recording of defendant's statement made to the interrogating officers, the trial justice concluded that defendant had sufficient command of the English language to understand the nature and meaning of his *Miranda* rights. Accordingly, the trail justice found that defendant's claim that he did not understand the significance of his *Miranda* rights was not worthy of belief.

Upon our review of the record, it is clear that there is sufficient legally competent evidence to support the trial justice's conclusion that defendant had knowingly and intelligently waived his right to remain silent as well as his right to counsel, and therefore the finding was not "clearly erroneous."

### III

In directing our attention to the final issue raised by defendant, that is, whether the trial justice has authority to impose consecutive life terms, we find defendant's argument to be without merit. The defendant contends that the trial justice has no authority pursuant to G.L. 1956 (1969 Reenactment) § 12–19–5 to impose consecutive life sentences for the murders of Helen and Jane. We disagree.

■ Section 12–19–5 provides the statutory authority for the imposition of consecutive sentences. We are of the opinion that this issue is controlled by the principles set forth in *State v. Upham*, R.I., 415 A.2d 1029 (1980). There we held that "[t]he right to impose consecutive sentences was well recognized at common law * * * [and] that § 12–19–5 is but a codification of the common law." [Citations omitted.] *Id.* 415 A.2d at 1033. Moreover, in *Upham*, we determined that § 12–19–5 did not require "that a defendant be actually serving a sentence before the consecutive sentence proviso becomes operative." *Id.*

■ Here, when the defendant appeared for sentencing, he had been convicted of two separate crimes. At this time, the trial justice imposed consecutive life sentences on the defendant. We find that this method of imposing sentence was no different from the method employed in *Upham*. Accordingly, we hold that pursuant to the provisions of § 12–19–5, the trial

justice had the legal authority to impose consecutive sentences.

The defendant's appeal is denied and dismissed, the judgments of conviction are affirmed, and the case is remanded to the Superior Court.

SHEA, J., did not participate.