[950 NE2d 489, 926 NYS2d 856]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DEAN PACQUETTE, Appellant.

Argued May 3, 2011; decided June 7, 2011

## POINTS OF COUNSEL

*Appellate Advocates*, New York City (*Steven R. Bernhard* and *Lynn W.L. Fahey* of counsel), for appellant. When an attorney representing appellant on a Manhattan drug case told Brooklyn homicide detectives waiting to take appellant from a Manhattan courtroom to Brooklyn that appellant was represented by counsel and that they should not question him, appellant's right to counsel indelibly attached and the statements subsequently taken by the detectives in the absence of counsel must be suppressed. (*People v Cunningham*, 49 NY2d 203; *People v Ramos*, 40 NY2d 610; *People v Arthur*, 22 NY2d 325; *People v Hobson*, 39 NY2d 479; *People v Donovan*, 13 NY2d 148; *People v Garofolo*, 46 NY2d 592; *People v Marrero*, 51 NY2d 56; *People v West*, 81 NY2d 370; *People v Bing*, 76 NY2d 331.)

*Charles J. Hynes, District Attorney*, Brooklyn (*Solomon Neubort* and *Leonard Joblove* of counsel), for respondent. Defendant's motion to suppress his statements was properly denied because when defendant made those statements, his indelible right to counsel had not attached on this case. (*People v West*, 81 NY2d 370; *People v Grice*, 100 NY2d 318; *People v Carranza*, 3 NY3d 729; *People v Davis*, 75 NY2d 517; *People v Hobson*, 39 NY2d 479; *People v Steward*, 88 NY2d 496; *People v Bing*, 76 NY2d 331; *People v Rosa*, 65 NY2d 380; *People v Henriquez*, 214 AD2d 485; *People v Garofolo*, 46 NY2d 592.)

**OPINION OF THE COURT**

READ, J.

On the evening of April 19, 2007, one man was shot to death and another was wounded (he was shot in the buttocks) in a shooting incident that took place outside an abandoned building on Bainbridge Street in Brooklyn, which had become a hangout for a group of young men. The body of the deceased victim was discovered in the building's basement, to which he evidently retreated after he was hit. Defendant Dean Pacquette was indicted for second-degree murder (intentional) (Penal Law § 125.25 [1]), second-degree assault (Penal Law § 120.05 [2]), and second-degree weapon possession (two counts) (Penal Law § 265.03 [1] [b]; [3]) in connection with the shooting. He moved to suppress inculpatory statements that he made to the police on the ground that they were obtained in violation of his right to counsel.

At the ensuing *Huntley* hearing, Detective Alan Killigrew testified that he identified defendant as a suspect because of information he received shortly after the shooting from two eyewitnesses. Then on May 17, 2007, he learned that defendant had been arrested for a drug crime in Manhattan. Detective Richard Amato traveled to Manhattan to "pick up" defendant and bring him to the precinct in Brooklyn for a lineup. Amato found defendant in a holding cell in Manhattan, waiting to be arraigned, and arranged through the New York City Police Department for him to be released temporarily into his custody.

A few hours after Amato arrived at the precinct in Brooklyn with defendant, the police conducted two separate lineups—one for each of the two eyewitnesses. Both eyewitnesses identified defendant. Before these lineups, at about 9:00 P.M., *Miranda* warnings were issued to defendant, who claimed that he knew nothing about the shooting; after the lineups, Killigrew advised defendant that he was "charged with homicide." Amato and Detective Erick Parks then escorted defendant back to Manhattan for arraignment for the drug crime. During the ride back, Amato "probably" let defendant know that he had been identified in both lineups.

Upon arrival in Manhattan, Amato spoke to prosecutors to clear defendant's release on his own recognizance after arraignment so that he could be taken back to Brooklyn. Meanwhile, Parks accompanied defendant to the courtroom. When Amato later joined them, defendant sat between the two detectives in the front row, waiting for his case to be called. At some point

before defendant's arraignment, attorney Daniel Scott was assigned to represent him on the drug charge. While Scott, Amato and Parks agree that they met and spoke in the Manhattan courtroom, their accounts of exactly what was said differ in certain respects.

According to Amato, Scott introduced himself as "the attorney for the arraignment on this case," meaning "[defendant's] drug case." Scott did not indicate that he represented defendant in any other case. Amato "took [Scott's] business card," which is how Amato later recalled Scott's name. When Scott asked Amato if he could speak to defendant "in private," Amato moved two rows back and Parks slid down the row and away from defendant so as to accommodate this request.

After defendant was arraigned and released on his own recognizance, Amato arrested him "for the homicide." The detectives then took defendant back to where he had been sitting in the courtroom because "the attorney . . . wanted to speak to him." Amato testified that he overheard Scott tell defendant that he was "not going across the bridge into Brooklyn to represent him," and that he didn't

> "represent him in the other case. He represents him in the drug case. He'll have an attorney for his new case in Brooklyn. He also said, I advise you not to speak to the police because I can't tell you that you cannot speak to the police but I'm advising you not to."

Amato added that Scott did not at any time tell him that he was representing defendant on the homicide charge; Amato gave Scott his business card at Scott's request.

Parks testified that he, Amato and defendant were sitting in the front row of the courtroom waiting for defendant to be arraigned when someone he assumed to be a Legal Aid attorney (whose name Parks did not recall) "approached" defendant and "asked if he could have a moment with" him. He and Amato then "moved [their] position" so as to allow the attorney to interview defendant while they still kept an eye on him. Parks also testified that at some point after the arraignment Amato had a "brief" conversation with the attorney, and that Amato informed him that he had overheard the attorney tell defendant that "he represent[ed] him on the Manhattan case," and "doesn't go over the bridge," and was "not representing him in

Brooklyn, that he'll represent him in the Manhattan case." According to Parks, the attorney never told him that defendant was represented by counsel, and never directed him not to question defendant.

Scott testified that when he was assigned to represent defendant in the drug case, he was notified by the clerk of the night court that two Brooklyn detectives had brought defendant to the courtroom. The clerk asked him to expedite the arraignment "because the detectives had brought [defendant] in." The clerk also alerted Scott to the "agreement between the detectives and the district attorney's office [for defendant to] be released into the detectives' custody." Scott introduced himself to defendant, who was sitting between the two detectives, and gave him his business card. He "may or may not have given" business cards to the detectives, but, in any event, "it was apparent who [he] was and what [he] was doing there."

Scott did not interview defendant, because "there was no privacy whatsoever." He simply read the felony complaint and asked defendant if he understood what he was being charged with; there was "no reason to discuss . . . bail because his ROR had . . . previously been worked out." Scott, who was not on the 18-B panel in Kings County, testified that he "clearly" recalled warning the detectives that defendant "was represented by counsel and that they should not question him." Similarly, he advised defendant not to "discuss any legal matter with [the detectives] whatsoever."[1]

Scott denied telling defendant or the detectives that he would not cross over the Brooklyn Bridge; he conceded, however, that he never indicated to defendant that he would be or was considering representing him in the homicide case, although he might have commented that he "would be happy to represent him." In answers to questions posed by the judge, Scott confirmed that he was not defendant's attorney for the homicide, and never told the detectives otherwise:

---

**1.** Although defendant insists that Scott made these remarks *post*-arraignment, his hearing testimony is, at best, ambiguous on the matter of timing. As relevant to this point, Scott testified that all his conversation with defendant took place within earshot of the two detectives, and lasted from 5 to 10 minutes "[t]otal," since "[i]t was just a question of informing [defendant] of the charges, never mind the bail, and *advising him not to speak*" (emphasis added). He also testified that "in the past" in similar situations he had "asked the judge while we were all in the well of the courtroom"—i.e., during arraignment—"to advise or reinforce the warning or advisement not to question [his] client."

"THE COURT: I just want to be clear, Mr. Scott, did you tell the detectives from Brooklyn who brought [defendant] over for his arraignment in Manhattan that you were representing [defendant] at any time? Did you tell them that?

"THE WITNESS: Yes, I did. Aside from it being—

"THE COURT: Okay.

"THE WITNESS: Yes, I said, he is represented by counsel, do not question him.

"THE COURT: As far as the drug case or the homicide case or both?

"THE WITNESS: I didn't specify.

"THE COURT: You didn't specify. So you had been engaged to represent him as an 18 B for the drug sale case in Manhattan, correct?

"THE WITNESS: Correct.

"THE COURT: You had not been engaged by anybody to represent him in the homicide case, correct?

"THE WITNESS: Correct.

"THE COURT: And you did not tell the detectives that you were representing him in the homicide case, correct?

"THE WITNESS: Correct."

On the way back to the precinct in Brooklyn, Amato mentioned to defendant that he

"found it kind of funny that this guy was telling [him] that he wasn't coming to Brooklyn to represent him. I didn't think it was right. I said, you know what? I said, I wouldn't look out for you like that. I said, you know what? If you tell us what happened, you know, maybe we can help you out."

Amato acknowledged that he was "try[ing to] get [defendant] to say exactly what happened the day of the homicide." Defendant was noncommittal, remarking that "he would have to think about it." As Parks put it, defendant "had already been in a lineup so he understood what the purpose of going back to the precinct was. We spoke to him about . . . his attorney, that the

attorney doesn't represent him here in Brooklyn. If he'd like to make a statement to Detective Killigrew, that's his choice."

Amato and Parks arrived at the precinct with defendant around 1:30 or 2:00 A.M. on May 18, 2007. At about 2:30 A.M., defendant announced to Amato and Killigrew that he wanted to talk about what happened. Amato contacted the assistant district attorney on duty to "make sure that [defendant's] right to counsel didn't attach because of the [Manhattan drug] case." The prosecutor advised Amato that he could speak to defendant "because he [did not] have counsel attached in this case. He [had] counsel attached in the drug case." Amato related this advice to Killigrew and, after Killigrew reminded defendant that "he was still under the Miranda warnings that we issued earlier," defendant gave an oral statement, which Killigrew took down.

Defendant admitted to shooting—first with a shotgun, until it jammed, and then with a handgun, until it, too, became inoperable—in the direction of the door at the Bainbridge Street building, causing those standing on the front stoop to scatter or run inside. He claimed that he only meant to scare these hangers-on, one of whom he feared on account of a previous run-in, and had been unaware until the following day that anyone had died. Defendant then repeated substantially the same statement on videotape to an assistant district attorney. At the beginning of the videotaped statement, defendant again waived his *Miranda* rights; near the end, he answered "no" when asked if he was represented by a lawyer in the homicide case.

In a May 30, 2008 decision and order, the judge denied defendant's motion to suppress his statements. He reasoned that "[a]ssuming arguendo that Scott told the Detectives not to question Defendant," that instruction was nugatory because even though "Defendant was represented by counsel on the Manhattan narcotics charges, he was not in custody on those charges, having been released on his own recognizance. Scott did not represent Defendant on the homicide charges, nor did he tell the Detectives that he did."

Defendant was tried by a jury before another judge. The two eyewitnesses testified. Killigrew read his transcription of defendant's statement, and the jury viewed the videotape. Scott was the only witness called by the defense. He again testified that he instructed the detectives not to question defendant. In the following series of questions and answers on cross-examination, however, he once more conceded that he did not

represent defendant on the homicide charge at the time defendant gave his statements:

> "Q Did you represent [defendant] on the homicide matter in this county, in Brooklyn?
>
> "A I was not assigned to represent him.
>
> "Q That is a simple question. You stood there in Manhattan Criminal Court. You had a conversation.
>
> "When you did that, did you represent this man on the homicide matter that these detectives had a duty and desire to investigate?
>
> "Yes or no?
>
> "A No."

The jury acquitted defendant of intentional murder (Penal Law § 125.25 [1]) and convicted him of the weapon charge based upon possession of a loaded firearm outside the home or business (Penal Law § 265.03 [3]).[2] The judge subsequently sentenced defendant to 15 years of imprisonment followed by five years of postrelease supervision. Defendant appealed. He argued that his indelible right to counsel had attached because Scott let the detectives know that he was represented by counsel and was not to be questioned, and he challenged his sentence.

In a decision and order dated May 18, 2010, the Appellate Division concluded that comments made by the sentencing court "demonstrated that it improperly considered" the murder count "as a basis for sentencing" (73 AD3d 1088 [2d Dept 2010]), and so vacated the sentence and remitted the matter to Supreme Court for resentencing.[3] The Appellate Division otherwise affirmed, deciding that any error in not suppressing defendant's statements was harmless because "the evidence of the defendant's guilt . . . was overwhelming, and there [was] no reasonable possibility that the alleged error might have contributed to [his] conviction" (id.). A Judge of this Court granted defendant permission to appeal (15 NY3d 808 [2010]), and we now affirm.

Defendant urges us to send this case back to the hearing court for the judge to decide whether Scott, in fact, told the detectives that defendant "was represented by counsel and that they

---

**2.** The judge did not submit the assault and other weapon possession count to the jury.

**3.** On July 21, 2010, Supreme Court resentenced defendant to the same sentence originally imposed.

should not question him." In defendant's view, if Scott made this assertion and gave this direction, the right to counsel indelibly attached, and the statements subsequently given by defendant in the absence of counsel must be suppressed even though Scott did not, in fact, represent defendant in the murder case at the time (or ever, for that matter); or, put slightly differently, defendant contends that Scott's neglect to "specify" to the detectives whether he represented defendant in "the drug case or the homicide case or both" created an ambiguity causing the indelible right to counsel to attach. We have never held that an attorney may unilaterally create an attorney-client relationship in a criminal proceeding in this fashion, and decline to do so now.

*People v Ramos* (40 NY2d 610 [1976]), for example, is not "virtually identical" to the situation here, as defendant contends. Ramos, who was wanted by the police in relation to a shooting in Manhattan, was subsequently arrested in the Bronx on a narcotics charge. At the arraignment in the Bronx on the drug matter, Ramos's attorney proclaimed in open court, in the presence of a detective from Manhattan who was waiting to take the defendant into custody, that "[f]or the record, [he had] advised [Ramos] not to make any statements to these police officers who are taking him into custody" (*id.* at 612). Ramos was then escorted to Manhattan, where he made an incriminating statement to an assistant district attorney. At the outset of this interrogation, he was equivocal about whether he wanted a lawyer—stating, for example, "What I can tell about this here I can tell you myself just like it happened. It can go against me, I would like a lawyer. I can tell you that myself, I hope it don't go against me, I am trying to get out of this jam"—before finally saying to the assistant district attorney "Go ahead, ask me some questions" (*id.* at 613).[4]

We held that the statement taken by the assistant district attorney should be suppressed because "the defendant was represented by counsel at the time of his interrogation" (*id.* at 618) by virtue of "the attorney's affirmative and direct action"—i.e.,

---

4. When Ramos agreed to talk to the assistant district attorney, he was well aware that he had earlier made incriminating statements to three Bronx police officers who questioned him about the shooting while he was awaiting arraignment on the drug charge: he told the assistant district attorney "I already talked to detectives, if they got that record already it don't make no difference" whether he again implicated himself in the shooting (40 NY2d at 613). The admissibility of these statements was not raised on the appeal (*id.* at 612 n 2).

his statements on the defendant's behalf in front of the judge in open court—"relative to the interrogation which was about to be commenced in connection with" the shooting (*id.* at 617). Further, we noted that Ramos's "specific although perhaps confused request: 'It can go against me, I would like a lawyer', [gave] testimony to his need *and desire* for legal advice from a lawyer representing his interests" (*id.* at 618 [emphasis added]).

Here, by contrast, Scott made no statements during the arraignment on the drug crime even arguably related to the homicide. If he had said in open court that defendant "was represented by counsel and that [the police] should not question him," the prosecutor (or the judge) would have had the occasion and the opportunity to ask him flat out whether he was defendant's lawyer in the murder case, as the judge and the prosecutor later did at the *Huntley* hearing and the trial, respectively. Moreover, there is no ambiguity here, as there was in *Ramos*, about whether defendant may have intended to invoke his right to counsel before making the inculpatory statements.

Indeed, in *People v Marrero* (51 NY2d 56, 59 [1980]), the other case principally relied upon by defendant, we equated the defendant's conduct to "a verbal request for counsel." Marrero, believing that he was being sought in a homicide investigation, asked a lawyer to contact the police and arrange for his surrender. As a result, the police took Marrero into custody in the attorney's office with the lawyer present. There was no doubt that the lawyer represented the defendant at that juncture of the homicide investigation. Later at the police station, Marrero made incriminating statements.

We held that the statements should be suppressed, observing that "[b]y consulting a lawyer to contact the police, and then surrendering in the attorney's office with counsel present, the defendant had manifested his own view that he [was] not competent to deal with the authorities without legal advice" (*id.* at 59 [internal quotation marks and citation omitted]). Further, we observed that the police did not know about the limited nature of the attorney's representation. Rather, "[a]ll they knew was that the defendant had sought the assistance of counsel *in connection with the charge they were investigating*" (*id.* [emphasis added]; *see also People v West*, 81 NY2d 370, 380 [1993] [citing *Marrero* for the proposition that "(a)bsent some indication that the representation had ceased, the police could not question defendant concerning *the very matter as to which*

*they knew he had a lawyer"* (emphasis added)]). Here, however, nothing about defendant's conduct suggests that he meant to invoke his right to counsel before he made the statements, and, also unlike the situation in *Marrero*, Scott had not already conspicuously represented defendant in an aspect of the homicide matter, causing the indelible right to attach.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN (dissenting). In the decision and order we now review the Appellate Division affirmed portions of a Kings County Supreme Court judgment convicting defendant of criminal possession of a weapon in the second degree. It did so over defendant's claim that his conviction had been obtained based on an inculpatory statement that should have been suppressed since it was given by him to Brooklyn police detectives in pursuance of an invalid waiver of his right to counsel. Although that claim was fully litigated at a pretrial *Huntley* hearing, the Appellate Division did not address its merits. It held instead that if it had been error to deny suppression of defendant's statements, the error was harmless in light of what it viewed as the overwhelming properly received evidence of defendant's guilt (73 AD3d 1088 [2010]). This Court has now evidently concluded that the evidence was not so overwhelming as the Appellate Division thought and, accordingly, that the validity of defendant's waiver and ensuing confession should have been determined as a necessary antecedent to affirming the judgment convicting him. Having so concluded, the Court apparently undertakes to do what the Appellate Division did not upon a hearing record which, although well developed, raises certain factual issues not yet resolved by a court with jurisdiction to do so. The testimony from which those issues arise may be briefly summarized.

Daniel Scott, the attorney assigned to represent defendant at his Manhattan arraignment on narcotics charges, testified that, in the presence of the Brooklyn detectives who had escorted defendant to the arraignment, and not privately, he "told [defendant] not to discuss any legal matter with them [the Brooklyn detectives] whatsoever." He also testified that he separately "advised [the detectives] that Mr. Pacquette was represented by counsel and that they should not question him." He stated as well that he never told Mr. Pacquette that he would not represent him on the Brooklyn homicide with which he was about to

be charged. The Brooklyn detectives, on the other hand, testified that defendant and Scott conferred privately but that portions of the attorney-client exchange were nonetheless overheard by Detective Amato. Amato reported that he heard Scott tell defendant that he would not represent him in his new case in Brooklyn. Amato and his partner Detective Parks both stated that Scott never advised them that defendant was represented by counsel and that they should not question him.

The hearing court did not decide whether Scott did in fact tell defendant in front of the detectives that he was not to speak with them about any legal matters or whether he told the detectives that they should not question his client. Nor did the hearing court decide whether Scott told defendant that he would not represent him in the Brooklyn homicide matter. This was because the court found dispositive Scott's acknowledgments that he was not ultimately engaged to represent defendant in the homicide and that he did not, in so many words, tell the Brooklyn detectives that he represented defendant in that case.

The majority, although declaring that Scott could not have unilaterally created an attorney-client relationship with defendant respecting the Brooklyn matter, does not go so far as to say that Scott in the course of representing defendant at his Manhattan arraignment could not have effectively signaled his entry into that matter, thus triggering, with respect to the homicide investigation, his client's indelible right to counsel. That, of course, would not be consistent with our decision in *People v Ramos* (40 NY2d 610 [1976]), which, on facts remarkably like those at bar, clearly recognizes that a defendant's attorney is, through "affirmative and direct action relative to [an] interrogation . . . about to be commenced" (*id.* at 617), capable of precluding an uncounseled waiver of the right to counsel in an unrelated matter, even one in which the attorney does not ultimately represent the defendant.[1] Rather, it appears to be the majority's position that what Scott said was not adequate to communicate to the detectives his entry into the Brooklyn matter. In taking this position, it must be supposed that the majority assumes for the purposes of its argument that Scott did in fact tell defendant in the detectives' immediate presence that he

---

**1.** We specifically rejected in *Ramos* the People's contention that Ramos's counsel could not have acted to prevent his prearraignment interrogation in an unrelated murder prosecution because he "never appeared at the defendant's murder arraignment or any other proceeding in connection with [that] case" (40 NY2d at 617).

was "not to discuss any legal matter with them whatsoever" and that he did not tell defendant that he would not represent him in Brooklyn. It must also be supposed that the majority is assuming, also for the sake of argument, that Scott did instruct the detectives "that Mr. Pacquette was represented by counsel and that they should not question him."

Having made these assumptions in defendant's favor in lieu of sending the matter back for factual findings that this Court may not make, the majority then says that "Scott made no statements during the arraignment on the drug crime even arguably related to the homicide" (majority op at 96). Even viewed in isolation, simply for their semantic content, Scott's directives unambiguously communicated to the detectives that his client was not to discuss with them *"any* legal matter . . . whatsoever"* (emphasis supplied) and, accordingly, that "they should not question [defendant]" about any legal matter whatsoever. A homicide is a legal matter.

Even if there were some doubt as to what Scott's words themselves meant, and really there should be none, the context in which they were spoken could have left absolutely no doubt that Scott was directing the Brooklyn homicide detectives quite specifically not to question defendant about the Brooklyn homicide they were investigating. At the time, all concerned knew that defendant was a suspect in a Brooklyn homicide, and, indeed, Scott was well aware that his client was, by prearrangement, to be immediately returned to the custody of the Brooklyn detectives at the conclusion of his expedited arraignment so that he could be timely arraigned on homicide charges in Brooklyn. Given this scenario, Scott's concern could not have been principally that defendant would be questioned in his absence about matters pertinent to the New York County drug case, something which his entry as counsel at defendant's Manhattan arraignment itself precluded, but that he would during the interval before his arraignment on the Brooklyn homicide charges be interrogated and make imprudent admissions with respect to that homicide. Certainly the Brooklyn homicide detectives, who had no interest in defendant's New York County drug case, would have understood that Scott's directives to them concerned the case that they were investigating and in which Scott's client would, in the coming hours, be a natural candidate for custodial interrogation.

Although the majority characterizes Scott's intercession as an attempt unilaterally to create an attorney-client relationship,

defendant was already represented by Scott and no competent defense attorney would simply abandon a client about to be interrogated as a suspect in a homicide. That Scott should have sought to enter the homicide case, if only temporarily to interpose himself between his client and the Brooklyn homicide detectives until formal appointment of counsel at the impending homicide arraignment in Brooklyn, was entirely appropriate. Whether Scott could have effectively accomplished that purpose by admonishing defendant and the Brooklyn detectives as he testified he did, is an inquiry that would seem to be controlled by *Ramos*.

In *Ramos*, we held that the statement by the lawyer appearing on Ramos's behalf at his Bronx arraignment on charges of drug possession—that he had "advised Mr. Santiago [Ramos] not to make any statements to these police officers who are taking him into custody" (40 NY2d at 616)—sufficed to signal to the officers the lawyer's entry into Ramos's unrelated Manhattan homicide case, and thereby triggered Ramos's indelible right to counsel in that case. The admonitions of attorney Scott in this case, both literally and contextually virtually identical to those of Ramos's attorney, are, if precedent is a constraint upon what we do, entitled to be accorded the same legal effect. Although the majority finds it important that in *Ramos* the attorney placed his directive on the record, there appears no reason why Scott's admonitions should be deemed less effective than those of Ramos's lawyer simply because they were not placed on the record. As we noted in *Ramos*, the critical inquiry is whether "an attorney has communicated with the police for the purpose of representing the defendant" (*id.* at 615, quoting *People v Arthur*, 22 NY2d 325, 329 [1968] [internal quotation marks omitted]). Accordingly, what was crucial in *Ramos* and what should be here as well is the circumstance, necessarily assumed in appellant's favor at this juncture, that the defendant's attorney took "affirmative and direct action relative to [an] interrogation . . . about to be commenced" (*id.* at 617) "in the presence of the police officer[s] taking [his client] into custody" (*id.* at 616).[2]

Even if there were some residual ambiguity as to whether Scott in his admonitory statements referred to the Brooklyn

---

**2.** While the majority urges that if Scott had placed his admonitions on the record the prosecutor or judge might have clarified the extent of his representation of defendant, there was obviously nothing to prevent the detectives

homicide, that ambiguity would not redound to the prosecution's benefit. We were very clear about this in *Ramos* where we said:

"If, in fact, the prosecution was in doubt as to whether an attorney had entered the proceeding, the burden should rest squarely on it to insure that the defendant's right to be represented by counsel be protected. The ambiguity of the lawyer's statement or the manner in which the defendant's attorney went about representing his client cannot be seized by the prosecution as a license to play fast and loose with this precious right. A defendant's right to counsel cannot be made to depend on whether in the sole judgment of the prosecution there has been sufficient activity and conduct of a proper character so as to compel a conclusion that the lawyer has entered the proceedings. Nor can we agree with the prosecutor that the defendant has an affirmative burden to point out to the prosecution that an attorney has entered the proceedings on his behalf. To hold otherwise would violate our prior holdings and seriously undermine this constitutionally guaranteed right" (*id.* at 617-618).

And, in the more recent case of *People v Marrero* (51 NY2d 56 [1980]), citing *Ramos* we again emphasized that

"[o]nce an attorney has appeared on the defendant's behalf we have refused to allow the police to rely on arguable ambiguities in the attorney-client relationship in order to justify police questioning of the defendant without the attorney being present (see, e.g., *People v Ramos*, 40 NY2d 610). We have indicated that if the police are uncertain as to the scope of the attorney's representation, the defendant should not be questioned (*People v Coleman*, 42 NY2d 500, 507)" (*id.* at 59).

While the majority understands these principles to apply only where the police do not know about the "limited nature of the attorney's representation" (majority op at 96), it is difficult to understand how that posited condition lends support to its position in this case, since, even if it were true that limited representation could not trigger representational rights, and

from pursuing the matter with Scott directly either at the arraignment or subsequently. As the majority recounts, "Amato 'took [Scott's] business card' " (majority op at 90).

manifestly it is not, there is no permissible basis for a supposition that the Brooklyn detectives knew, at the time they obtained defendant's waiver of his right to counsel, about the "limited nature" of attorney Scott's representation of defendant. Only by making credibility findings on the disputed issues of what was said by Scott to defendant and what Amato overheard, would it be possible to conclude that the Brooklyn detectives had some reliable basis for believing that Scott would not represent defendant in the Brooklyn case. If such a finding is to be made and relied upon in disposing of defendant's motion, the case should be remitted for that purpose; the finding may not be made in the first instance by this Court and, obviously, what the detectives knew is not appropriately assumed adversely to appellant as a basis for our denial of his appeal and our accompanying statement of the law.

It is also suggested that *Ramos* and *Marrero* should not control here because in those cases the defendants manifested a need for legal assistance in the matters being investigated while defendant did not. It is, however, a basic and long-standing principle of our right-to-counsel jurisprudence that, if an attorney has entered a matter, the right to counsel indelibly attaches rendering it irrelevant, in the event of a subsequent uncounseled custodial waiver of the right, whether the defendant was, in interacting with his or her interrogators, not evidently averse to speaking or whether there was some manifestation by the defendant of a need for a lawyer. As we reiterated in *People v Hobson* (39 NY2d 479, 481 [1976]) and has since been the governing rule of law, "[o]nce a lawyer has entered a criminal proceeding representing a defendant in connection with criminal charges under investigation, the defendant in custody may not waive his right to counsel in the absence of the lawyer." If Scott entered his client's homicide case, the uncounseled waiver subsequently obtained from his client in that case was invalid and the confession consequently elicited must be suppressed. Because it is not possible to say on any properly assumed set of facts considered in light of *Ramos* that Scott did not effectively enter the proceeding, the matter should be remitted so that the factual findings necessary to a proper determination of defendant's suppression motion can be made.

Defendant would undoubtedly have been protected from making an uncounseled waiver of his right to counsel if he had not by careful prearrangement been "released" from custody on the

represented New York County matter to the Brooklyn detectives (who promptly rearrested him). It is questionable whether this artifice should be deemed effective to avoid attachment of the indelible right under *People v Rogers* (48 NY2d 167 [1979]) where, as here, the detectives were obviously aware of the extant representational relationship, having been present at its inception, and fully intended in the hours after defendant's "release" to subject him to custodial questioning. But accepting that the "release" of defendant was not a contrivance simply to avoid the triggering of a representational right, it is clear that the situation was one involving great peril to defendant's legal interests and, accordingly, one which defendant's lawyer could not treat with indifference as it unfolded before him. Although there may not have been an automatic entitlement to counsel in the homicide case by reason of the unrelated representation in the designedly noncustodial New York County matter, there was, as we have recognized in *Ramos*, certainly in this situation a need and a corresponding prerogative on the part of the lawyer affirmatively to act to protect his client's interests. On this record, I do not think it possible for this Court to conclude that he did not do so, indeed, if it were necessary, that he did not do so "conspicuously."

Judges CIPARICK, GRAFFEO, SMITH and PIGOTT concur with Judge READ; Chief Judge LIPPMAN dissents in a separate opinion in which Judge JONES concurs.

Order affirmed.