OPINION OF THE COURT
Fuchsberg, J.
This appeal calls upon us to explore two recurring issues involving the safeguards assuring that the constitutional right to counsel is not thwarted. The first is whether the defendant’s constitutional right to counsel was impermissibly impeded by the inadequacy of police procedures that delayed communication between the defendant and a lawyer retained on his behalf. The second is whether so-called casual police inquiries that, without seeming to intend to do so, nevertheless elicited unwarned and uncounseled incriminatory answers were violative of the defendant’s rights.
The case may be said to have begun on October 26, 1975, *597 when the partially clad body of a 19-year-old woman was found in a wooded area abutting a Suffolk County tavern. Before the day was out, the defendant, Steven Joseph Garofolo, had twice confessed to her murder, for which he has since been convicted after trial by jury.[1] Pretrial motions seeking a broad spectrum of relief, including the suppression of both the initial and later confessions as well as certain physical evidence the location of which was thereby disclosed, were all denied. The Appellate Division, unanimously and without opinion, upheld the judgment. For reasons that in the main focus on the various confessions, we are forced to conclude that a new trial is required.
We start with the chronology of events leading to defendant’s arrest. In doing so, we accept the suppression court’s findings, which, being supported by the record and affirmed by the Appellate Division, are now beyond our review (People v Gruttola, 43 NY2d 116, 122-123).
The defendant first came to the attention of the police when he telephoned the decedent’s parents to report that on the night of the crime he had seen the murdered woman exiting a tavern in the company of three young men. He left his name and number and when Suffolk County police, who followed up on this information, located him at a pizzeria at which he was employed, the defendant readily agreed to accompany them to Suffolk County’s fourth homicide squad to assist in identifying the individuals he claimed to have seen with the victim. The defendant reached the squad’s offices at about 8:20 p.m.
Very soon after his arrival, Detective Rodriguez, who was in command of the investigation, noted inconsistencies in the story Garofolo had begun to tell. His suspicions aroused, the interrogating officer, on the hypothesis that Garofolo might well turn out to be the perpetrator of the crime, gave him the warnings prescribed by Miranda v Arizona (384 US 436, 475). At this juncture, Garofolo, after protesting that he had nothing to hide and would speak to the police without a lawyer, broke into tears and began to pour out a story of how he had choked and bludgeoned the deceased with a nightstick to still her when "she screamed I was trying to rape her”. All this had happened so precipitously that it was then only about 8:30 p.m. Further querying followed this revelation so that the *598 oral questioning was completed at approximately 8:55 p.m. The police then undertook to reduce Garofolo’s confession to writing, a task they had accomplished by 9:40 p.m., at which time the defendant and the police officers initialed and signed a three-page statement.
In the course of making both the oral statement and the written one that ensued, Garofolo disclosed that he had disposed of the nightstick, a pizza shirt he had worn during the commission of the crime and an earring belonging to the decedent in certain garbage receptacles. He also told the police that he had discarded his undershirt along a highway. Armed with this information, several policemen, promptly dispatched to search for these articles even while the interrogation was yet in progress, apparently had no difficulty in locating them.
Meanwhile, during much of the time that the fourth squad was holding Garofolo, Eric Naiburg, a lawyer previously retained to represent Garofolo on an unrelated pending charge, was busy trying to find his client. He had undertaken that quest at the instance of Garofolo’s father, who could tell the lawyer only that his son had been taken away by two police officers but not why he was taken or where he was being held. The time when the father spoke to the lawyer was never fixed with any precision. Naiburg would later estimate that the senior Garofolo’s call may have arrived as late as 8:30 p.m. Whenever it was, it is undisputed that Naiburg did not check with Suffolk County’s central police headquarters until 9:10 P.M.
Not that Naiburg did not act with speed. His first efforts to locate his client were in other directions. He initially tried the Suffolk sixth precinct, where Garofolo had once been taken in connection with the earlier charge. Upon learning his client was not there, on the chance that the arrest might have occurred in adjoining Nassau County, he next contacted the Suffolk fugitive squad but met with equal lack of success. Only then did he call the Suffolk headquarters, where, asking for someone in authority, he was connected with Detective Violet Joyce.
Joyce was co-operative, but no central pool of information of persons in the custody of the police department was available to her nor, so far as this record shows, was there one in existence at all. She agreed to make a round of inquiries of all seven Suffolk "general service” squads. Carrying out that *599 commitment, she made her initial inquiry of the fourth squad, which covered the area of defendant’s residence and was located across the courtyard from the headquarters itself,[2] and then followed up with the other six. Each advised her that it had no prisoner named Garofolo. By the time she got back to Naiburg to report the results, it was at least 9:30 p.m. In the course of her report to him, she observed that she had had some trouble reaching the fourth squad because its personnel was engaged in a homicide investigation, but when she did get through she was told no one was under arrest. Of course, as was later to be learned, the defendant, who was then not only in custody but already under arrest for a confessed murder, was in fact being held incommunicado merely a stone’s throw from where Joyce was conversing with his lawyer. Be that as it may, it was not until 11:00 p.m. that Naiburg was finally informed of Garofolo’s whereabouts.
 In relating these facts to the applicable law, we emphasize that the fundamental rule in this State is that, once the police have been apprised that a lawyer has undertaken to represent a defendant in custody in connection with criminal charges under investigation, the person so held may not validly waive the assistance of counsel except in the presence of the lawyer (People v Hobson, 39 NY2d 479, 481; People v Arthur, 22 NY2d 325, 329). This proposition is purposed to do more than merely help to assure that the right to counsel is the "effective” one guaranteed by our Constitutions (US Const, 6th Arndt; NY Const, art I, § 6). Sensitive that other constitutional rights, such as the privilege against self incrimination and the one guaranteeing due process, are far from self-executing, it looks to their viability as well (People v Donovan, 13 NY2d 148, 151). It therefore applies whenever a defendant, whether denominated by the police as an "accused”, a "suspect”, or a "witness”, is deemed to be in custody (People v Sanchez, 15 NY2d 387, 389).
These protections in mind, we turn to consider when, if at all, the entry of counsel was sufficient to invoke them in the present case. In that connection, our recent decision in People v Pinzon (44 NY2d 458) forecloses any argument but that Naiburg’s 9:10 p.m. call to Detective Joyce at police headquarters must be so construed and that any uncounseled *600 statement taken thereafter must be deemed inadmissible. In this conversation, Naiburg advised Joyce that he represented Garofolo on the previous charge and that, though he was not aware of the nature of his present brush with the law, he assumed it was unrelated. This sufficiently identified his professional interest in the new charge. Nor was it necessary for him to state explicitly that his client was no longer to be questioned in his absence (People v Arthur, 22 NY2d 325, 329, supra), for it is almost universally recognized that, at this stage at least, "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances” (Watts v Indiana, 338 US 49, 59 [Jackson, J.]). Finally, since a defendant’s rights are not to be impaired by "lack of communication within the law enforcement agencies”, the notice Naiburg thus imparted was nonetheless chargeable to the police despite the fact that Joyce was neither a participant in the ongoing interrogation nor possessed of any personal knowledge that it was taking place (People v Pinzon, 44 NY2d 458, 463-465, supra).
In Pinzón, counsel, whose services there too had been enlisted by the defendant’s family, had thrice called police headquarters of this very same county and on each occasion a civilian employee, without making any further attempt to verify the fact, unintentionally misinformed him that his client was not in custody. Extrapolating from rulings in cases in which the police, acting in bad faith, had sequestered a defendant and thereby frustrated a lawyer’s efforts to intervene (see People v Donovan, 13 NY2d 148, supra; People v Failla, 14 NY2d 178), we held that "the police should have been on notice that an attorney had appeared on behalf of the defendant then in custody”. In so saying, we noted that it was for the police "to establish and maintain procedures which will insure that an attorney representing [a person in custody] may communicate with him and with the officials responsible for the investigation, without unreasonable delay” (People v Pinzon, supra, p 464).
True, in the case before us, once Detective Joyce received Naiburg’s call at headquarters, she did make a diligent effort to ascertain whether and where Garofolo was being held. But we now make explicit what was implied in Pinzón: that good faith efforts are made to locate a defendant who is taken into custody does not absolve the police of their responsibility if their internal procedures are inadequate to keep track of *601 those against whom the restraining hand and the accusing finger of the State have come to rest. In a Nation that prizes individual liberty, it is not asking too much to expect that, in those cases where interference with a person’s liberty becomes necessary, no undue delay prevent anyone so circumstanced from securing the protections — here the right to counsel — to which he or she is entitled.
These principles were ignored in this instance. Not only did Detective Rodriguez and his fellow officers do nothing to facilitate access by counsel, but their inaction foreclosed the possibility of any such communication. More than that, though Garofolo had become the target of the investigation the better part of an hour before Detective Joyce officially called the fourth squad from her headquarters post, she was incorrectly informed that no one by that name was in custody. Also, while neither Rodriguez nor any of his aides would spare the few seconds it might have taken to give headquarters timely advice of Garofolo’s detention, the record shows that Rodriguez twice found it convenient to leave the interrogation room in order to dispatch officers to retrieve evidence the location of which had emerged from the oral confession. Most troublesome of all is the fact that this conduct does not appear to contravene any regulation or system designed to enforce respect for the right to counsel. Rather, there is no evidence of any provisions to that end.
On this score, we need not speculate as to how an adequate monitoring system should be constituted other than to say that it must be one reasonably calculated to achieve its purpose with swiftness and certitude. What measures need be adopted to secure this level of efficiency obviously will depend, among other things, on the complexity and size of a particular police department and its domain. Regardless of the method, it goes without saying that a system that promptly advises an attorney or others entitled to inquire of the client’s status will also inform the relevant police unit that a defendant in its custody is represented by an attorney.
For these reasons, and because by 9:10 p.m. no significant portion, if any at all, of Garofolo’s confession had yet been reduced to writing (see People v Donovan, 13 NY2d 148, 150-151, supra; People v Failla, 14 NY2d 178, 182, supra; cf. People v Bevilacqua, 45 NY2d 508, 512-513), we hold as a matter of law that it should have been suppressed.
The fact that the written statement was vitiated by an *602 abuse of the right to counsel, however, did not mean that the oral statement that preceded it was similarly tainted. Naiburg, who might better have adopted the caution of requesting that a police blotter or other record entry be made of each of his communications to the police, was less than precise in fixing the times of those that preceded the one at 9:10 p.m. (cf. People v Failla, supra, p 178). From our review of the record, we cannot say that the suppression court could not find, as it did, that Naiburg did not enter the proceeding before the oral statement was completed. Nor was the right to counsel triggered at that time merely by the fact that Garofolo had previously retained Naiburg on the unrelated charge (People v Coleman, 43 NY2d 222, 226).
But the People contend that, because the untainted oral confession was identical in all material respects with the written one, it was not error to have failed to suppress the latter. We do not agree. It is well-nigh impossible to avoid the conclusion that the written version was accorded greater weight by the jury than was the oral one (see People v Donovan, supra, p 153). As witness the rules relating to parol evidence and the Statute of Frauds, written documents, especially those signed by the parties to be charged, are commonly understood, even if sometimes undeservedly, to evince a degree of deliberation and authenticity not generally associated with oral proof of the same events (see, generally, 9 Wigmore, Evidence, § 2454). This is not a preference confined to the legal mind alone. Serious written materials, in book form or otherwise, ordinarily are looked at as more reliable than their more evanescent oral counterparts, which are so much more often subject to the vagaries of memory and narration. So, when coupled with a confirmatory writing, even an oral statement takes on added credibility. Thus, by reiterating and, hence, corroborating the substance of the oral confession, the written statement may well have erased whatever doubts the jury entertained concerning the credibility of the witnesses upon whom the People had to rely to prove the contents of the unwritten one.
And, precisely because defendant nowhere alleges that the written confession was in any relevant respect different from the oral version, we find meritless his claim that the evidentiary fruits of the earlier statement must be suppressed. On the affirmed findings of fact before us, we cannot conclude otherwise than that the location of all the items connected *603 with the crime were disclosed in the validly taken oral confession with sufficient specificity for the police to have found them. In fact, as already indicated, the retrieval of the evidence was initiated well before Garofolo’s statement had been reduced to writing.
We now turn to the statements elicited from the defendant while he was confined to the Suffolk County Jail awaiting trial. Though without a doubt Garofolo’s right to counsel then had attached and he was not to be questioned in the absence of his lawyer, the lower court, categorizing the answers Garofolo gave on that occasion as "gratuitous responses to the correction officer’s vocalized musings”, held them admissible as spontaneous and voluntary utterances under the narrow doctrine enunciated in People v Kaye (25 NY2d 139). They should have been excluded.
The opening question, casually asked of the defendant by a correction officer on the day of arraignment, was "how [Garofolo] had made out in court”. The query should never have been made. In the context in which it was put it could not be on the order of a neutral greeting or comment. For a person trained in police work, it had to possess at least a potential for triggering disclosures broader than those required by the question itself. It played upon the natural penchant to volunteer that even cautioned witnesses will so often exhibit. In fact, in this instance, the officer having seen certain incriminating passages in a letter Garofolo had written to his parents the day before, it does not take much to surmise that the question was not a disinterested one. Not surprisingly, the response from Garofolo was that he had told his attorney that he had killed Ms. Wilkinson and that a plea was being negotiated. The officer did not desist at this point. A little later, he returned with the provocative remark, "I thought you didn’t kill the girl”, bringing forth more incriminatory replies. This stimulus, calling for an express admission or denial of guilt by the defendant, clearly violated the stringent safeguards that surround the right to counsel and, significantly, was apparently promptly reported by the correction officer to his superiors.
While some exchanges between a defendant and his jailers must of necessity occur, there is no excuse for inquiries such as those put here. Queries aimed at the issue of a defendant’s guilt or innocence must be proscribed irrespective of their underlying motivation. These hardly masked a form of custo *604 dial interrogation no less invidious than that condemned by Miranda (People v Maerling, 46 NY2d 289, 301-303; Brewer v Williams, 430 US 387, 392-393; Rhode Is. v Innis, RI Sup Ct, Aug. 8, 1978, cert granted 47 USLW 3566). People v Kaye (25 NY2d 139, supra) certainly does not give it sanction. Indeed, an English court’s admonition that in like circumstances an officer should "keep his mouth shut and his ears open” is not only blunt but good advice (Reg. v Male, 17 Cox Crim Law Cases, 689, 690).
As to the reliance by the People and the dissenter on the harmlessness of these errors, suffice it to say that, on the whole record we cannot say that "there is no reasonable possibility that the error might have contributed to defendant’s conviction” and that, being constitutional errors, they were not "harmless beyond a reasonable doubt” (People v Crimmins, 36 NY2d 230, 237).
Finally, because there must be a new trial, we comment briefly on the defendant’s assertion that the letter he wrote to his parents from the Suffolk County Jail was illegally searched and seized by the correction officer. The argument fails in view of affirmed factual findings that Garofolo was made aware of the jail’s routine procedure to inspect all prisoners’ correspondence before he delivered the unsealed letter to the correction officer (see Stroud v United States, 251 US 15, 21-22).
The order of the Appellate Division should be reversed and the case remitted for a new trial.

. The convictions were on counts of felony murder and murder in the second degree, for each of which the defendant received prison sentences of 25 years to life, to be served concurrently.

. Although the fourth squad is a part of headquarters, it is physically located in the same building as the fourth precinct.