■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GARY BROOKS, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Queens County, rendered September 13, 1976, convicting him of murder in the second degree (two counts) and robbery in the first degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of defendant's motion to suppress certain incriminating statements made by him subsequent to his arrest. Judgment reversed, on the law and the facts, motion to suppress statements granted, and new trial ordered. The principal issue raised on this appeal is whether defendant's postarrest statements made to police officers in the absence of his attorney, who had already entered the proceeding, were properly held

admissible at trial as voluntary and spontaneous declarations. On May 30, 1975 two men entered the St. John's University bookstore and committed a robbery therein. In the course of the robbery one of the men shot and fatally wounded the security guard, one Richard Rothar. Defendant Gary Brooks is the person charged with the shooting. On June 5, 1975 Detective Robert Frank arrested Brooks at his sister's home at 103 Sterling Street in Brooklyn. They returned to the 113th Precinct at 12:20 P.M., where Detective Frank promptly administered the *Miranda* warnings. Frank telephoned the office of Brooks' attorney, Stanley Zinner, and spoke with a Mr. Finger. Mr. Zinner subsequently arrived at the precinct and observed a lineup which was conducted for one of the eyewitnesses to the crime. Zinner instructed the defendant not to speak to the police and informed the desk officer that he did not want his client questioned. The statements which are the subject of this appeal were made in the first instance to a detective, Bruce Brennan, later that afternoon. Brennan was therefore the primary witness for the People at the *Huntley* hearing and, on direct examination, he related the circumstances of the defendant's confession as follows: On the day of Brooks' arrest, Brennan arrived at the 113th Precinct at or about 4:00 P.M. He was not specifically assigned to the case, but was informed by his brother officers that Brooks had been advised by his attorney to remain silent. Brennan had previously met Brooks in the course of his police duties and, upon entering the detention area, he approached Brooks' cell and introduced himself by way of renewing their acquaintance. Knowing that Brooks had chosen to remain silent, Brennan engaged him only in general conversation. Brennan then returned to his desk which was about 10 feet from Brooks' cell and spent the next two and one-half hours doing paperwork. According to Detective Brennan, it was the defendant who next spoke and asked the detective "what's going to happen?" Brennan informed Brooks that Detective Frank and the others were in the process of obtaining a search warrant for his sister's home in the hopes of locating the murder weapon. At this juncture, again according to Brennan, Brooks immediately answered, "The gun's not at my sister's house. I sold it to someone in a bar across the street from the Marcy Avenue project in Brooklyn." Brooks then asked for Brennan's help and the latter answered that he could give no guarantees. At this point defendant broke down and related the details of the robbery, including the name of his accomplice. (Later, Brooks repeated his confession to Detective Frank and an Assistant District Attorney, all without the presence of his attorney.) On cross-examination, Brennan's story was strongly challenged. Although Brennan claimed to have known Brooks prior to the date of his confession, Brennan was unable to clearly state where, when or how he had become acquainted with Gary Brooks. The gist of Brennan's testimony was that he must have met Brooks some time during the period between 1969 and 1975 when Brooks was either a complainant, a defendant, or a witness. In short, Brennan's recollection of his prior acquaintance with Brooks was quite weak. In addition to the foregoing, when Brennan was asked by defendant's counsel whether he had used the words "they are going to rip the place apart" when speaking to the defendant, the detective answered: "I don't believe so. I could have. There's a good possibility if he were to ask me, you know, could they ruin, you know, any property or if the door was refused to be open, could they knock it down. I probably could have." Later, when Brennan was asked if he had told Brooks that he could halt the search if Brooks would tell him where the gun was, Brennan answered: "I didn't tell him anything as far as that, any guarantee. I said that the mere fact that the warrant, if it is issued, would

be executed, would be to search for a gun. And that would be all. I said if we do know where the gun is, I don't believe there will be any reason to go to Sterling Street now if we knew where the gun is because it wouldn't be at Sterling Street if that's what you're telling me is true." Brennan further testified that he had advised Brooks that "everything could be avoided, unpleasant situation", if they knew where the gun was. He insisted, however, that he had only discussed avoidance of the search *after* Brooks had blurted out the statement that he had already sold the gun. Defendant Brooks testified on his own behalf at the *Huntley* hearing that while he was detained in his cell at the 113th Precinct there were several detectives in the detention area, and that he overheard them discussing the fact that they were going to search his sister's home and would tear it apart in the course of looking for the murder weapon. He stated that Detective Brennan told him that they were going to "wreck" his sister's "nice house", and that the detective then asked him where the gun was and promised that if he co-operated with the police something would be done to prevent further embarrassment of the family. At the close of the *Huntley* hearing, the court ruled that the defendant's statements had been voluntary and spontaneous and were, therefore, admissible. As a result of Brooks' confession, the police arrested one Michael Johnson, who confessed to being Brooks' accomplice. The codefendants were tried together, both confessions were admitted into evidence and they were both convicted of murder in the second degree and robbery. This appeal concerns only defendant Brooks.* The judgment of conviction must be reversed and a new trial ordered. It is, by now, well established that "Once a lawyer has entered a criminal proceeding representing a defendant in connection with criminal charges under investigation, the defendant in custody may not [thereafter] waive his right to counsel in the absence of the lawyer" *(People v Hobson,* 39 NY2d 479, 481; *People v Garofolo,* 46 NY2d 592). Of course, a subsequent statement which is both voluntary and spontaneous remains admissible, even if made in counsel's absence *(People v Kaye,* 25 NY2d 139; *People v Hobson, supra,* p 483), but the People at the *Huntley* hearing have the burden of proving these facts beyond a reasonable doubt *(People v Huntley,* 15 NY2d 72). On the record before us, the People have not sustained this burden. In his own testimony, Detective Brennan admitted that he might have described the unpleasant aspects of a police search to the defendant, and further admitted that he explained to the defendant that his sister's home would not have to be searched if the police knew that the gun was elsewhere. He claims, however, that this discussion only took place *after* the defendant had admitted selling the gun and that the former admission had been spontaneous. In our view, this account is incredible, which leads us to the conclusion that the detective's statements were made *prior* to the defendant's admissions, subsequent to and with knowledge of the entry of counsel into the case and in the latter's absence. Under these circumstances, the admissions can hardly be considered voluntary or spontaneous within the meaning of *People v Kaye* (25 NY2d 139, *supra).* Any statements elicited by an agent of the State, however subtly, after the entry of counsel into the case, without a waiver made in the presence of or with the assistance of counsel, are inadmissible *(People v Hobson,* 39 NY2d 479, 481, *supra).* Accordingly, the statements made to Detectives Brennan and Frank, and all subsequent statements, should have been ruled inadmissible at the trial and must

---

* Codefendant Johnson has also appealed his conviction to this court, but his appeal is, as yet, unperfected.

remain such upon any retrial. For this reason we note that in the event that Johnson's appeal also results in a new trial and that a joint trial happens to be scheduled, the desirability of a severance should be carefully considered. In light of our determination that there must be a new trial, it is unnecessary to determine whether the trial court's refusal to charge manslaughter in the first degree as a lesser included offense to common-law murder was proper based on the evidence adduced at the first trial. Whether the charge must be given, if requested, at any new trial will depend upon the evidence adduced thereat (see *People v Johnson,* 45 NY2d 546). The remainder of defendant's contentions are either lacking in merit or need not be considered in view of our determination herein and/or the absence of a timely objection (see CPL 470.05, subd 2). Suozzi, Gulotta and Martuscello, JJ., concur.

Titone, J. P., concurs in the result, with the following memorandum: I fully agree with the reasons given by my colleagues for reversal of defendant's conviction for murder in the second degree and robbery in the first degree. Under the circumstances, the action of Detective Brennan in importuning defendant to relate the details of the robbery by indicating that a search warrant was being obtained to search the home of defendant's sister for the murder weapon, was highly improper and clearly violated defendant's right to remain silent on advice of counsel. However, I am also of the opinion that prejudicial and reversible error was committed by the prosecutor by his cross-examining defendant and an alibi witness on their failure to advise either the police or the District Attorney's office of an alibi defense at the time of arrest and prior to trial. Furthermore the prosecutor compounded such error by alluding to these matters at length during summation. Such tactics may not be used by a prosecutor as a means of discrediting either the accused or an alibi witness, either upon cross-examination or during the People's summation, and may be grounds for reversal of a conviction and the granting of a new trial (see *People v Hamlin,* 58 AD2d 631; *People v Smoot,* 59 AD2d 898). Although defense counsel failed to object to such actions of the prosecutor, because of their prejudicial nature I believe that in the interest of justice they are also grounds for reversal (see CPL 470.15, subd 6).