OPINION OF THE COURT
John L. DeMarco, J.
The People gave notice of their intention to introduce at trial statements that defendant made to police investigators. Defendant moved to suppress the statements as involuntarily made. The People oppose suppression. Accordingly, the court conducted a Huntley hearing on the matter. The hearing occurred on three separate dates—August 28, 2014, October 14, 2014, and October 23, 2014. The court made no findings of fact on the record regarding the hearing, and the parties expressed a desire to file written closing arguments. Accordingly, the court set a scheduling order for the return of counsels’ submissions at the conclusion of the Huntley hearing on October 23, 2014. The defendant filed his written submission on or about October 31, 2014. The People filed their written response on November 10, 2014.
The court, having reviewed counsels’ written submissions as well as the exhibits received in evidence at all the prior proceedings, and based upon the credible testimony elicited over the course of the hearing, makes the following findings of fact and conclusions of law.
*793 Findings of Fact
Investigator Dave Giudici and Investigator Dave Simpson interviewed defendant on December 3, 2013 at the Public Safety Building (PSB). The investigators began the interview at approximately 12:52 p.m. by introducing themselves to the defendant and asking him pedigree questions. Investigator Giudici advised defendant of his Miranda rights at approximately 12:57 p.m. and obtained the requisite rights waiver, after which a conversation occurred. The entire conversation, including the rights advisement and waiver, was electronically recorded and received as People’s exhibits 9 and 10, without objection, at the hearing. The court has since reviewed the rights’ waiver and the recording.
Investigator Giudici testified, in pertinent part, as follows.[1] The defendant was at no time, and in no way, coerced or threatened, or promised anything to get him to talk. The defendant did not appear to be sick, exhibited no signs of injury or indicia of intoxication and was at all times responsive to the questions posed to him. The defendant had not consumed any drugs or alcohol on the day of the interview. Investigator Giudici also testified that the defendant never asked for an attorney or for the conversation to stop. Throughout the approximately nine hours, or so, the defendant was held in the interview room,[2] he was afforded numerous breaks, time to go to the bathroom, cigarettes, and food and drink. Although defendant initially contrived a story that he was at a different location at the time of the shooting thereby proclaiming his innocence, he ultimately acknowledged for the first time, in sum and substance, at approximately 4:06 p.m. on the interview monitor,[3] that he was the front seat passenger in the suspect vehicle from which he fired two shots at the victim with a handgun. The defendant thereafter makes various additional incriminating admissions.
*794 At about 4:36 p.m., Investigators Giudici and Simpson stepped out of the interview room. Investigator Giudici was then advised by Investigator Sergeant Zenelovic that Assistant Public Defender Joshua Stubbe had called the police department claiming that he represented the defendant. Investigators Giudici and Simpson, after receiving additional information from Sergeant Zenelovic,[4] reentered the interview room at 4:43:40 p.m. Investigator Simpson, after reassuring the defendant, in substance, of the potential value of telling his side of the story to the police, at 4:44:39 p.m. asks the defendant whether he knows “a dude named ‘Josh Stubbe.’ ” The defendant responds by shaking his head in the negative and asks, “Who is that?” Investigator Simpson states, “You never heard of the guy before, you never met him?” Defendant shakes his head side to side in the negative. Investigator Simpson states, “[DJon’t say anything, just hear out what I gotta [sic] say, the whole thing. Some lawyer called and asked, said that he was Josh Stubbe and that he was gonna [sic] represent you, okay?” Defendant casually shakes his head in the affirmative. Investigator Simpson continues,
“Now, hold on and listen to me. If he represents you, then you can’t talk to me anymore and get your version out, okay, and explain things, okay? If you want, okay, and at this point don’t want him to represent you, you can tell us that and we can keep going and get your version out here which is gonna [sic] be a benefit, okay?”
Defendant, chin to his chest, does not respond and remains motionless. Investigator Simpson presses onward, “Do you wanna [sic] keep talking to us and get your whole explanation out?” After a slight pause, defendant lifts his chin from his chest and shakes his head in the affirmative. Simultaneously, Investigator Simpson interposes, “Yes or no[,]” to which defendant responds, “Yeah.” Investigator Simpson states, “So you wanna [sic] keep talking to us?” Defendant says, “Yeah.” Investigator Simpson confirms, “So at this point, you don’t want Josh Stubbe to represent you at this point?” Defendant shakes his head in the negative and quietly mutters “No.” Simpson concludes, “But another time you can, okay?” Defendant looks up and says, “Okay.” Investigator Simpson says, “Alright?” Defendant mildly shakes his head in the affirmative. Simpson ascends from *795 his chair and in an encouraging tone tells the defendant, “Keep your head up, alright[,]” and with his left hand gently taps the right side of the defendant’s head. The investigators exit the interview room at approximately 4:45:46 p.m. They return at approximately 4:49:40 p.m. and continue the interrogation until approximately 4:59:08 p.m. at which time the investigators exit the interview room.
At approximately 5:50:50 p.m., an unknown officer retrieved defendant from the interview room and escorted him to be fingerprinted. Defendant is returned to the interview room shortly thereafter and his girlfriend, Ida Campbell, enters the interview room, alone, at approximately 6:12:28 p.m. Defendant and Campbell converse in the interview room outside the immediate presence of the police, though the audiovisual equipment remained operational. Defendant and Campbell conversed until approximately 6:30 p.m. at which time Campbell exits the interview room. At approximately 6:41:55 p.m. a uniformed officer enters the interview room, obtains additional pedigree information from defendant, and exits the interview room at approximately 6:46:50 p.m. The defendant is ultimately retrieved from the interview room at approximately 7:34:30 p.m.
The defense called two witnesses: Stubbe, and defendant’s mother, Angel Rankin. Stubbe’s testimony, which began on August 28, 2014 and concluded October 23, 2014, included, in pertinent part, that he has been employed at the Monroe County Public Defender’s Office (Public Defender’s Office) as an assistant public defender for 12 years, and currently serves as a Special Assistant Public Defender, assigned generally to represent financially eligible individuals charged with violent felony offenses. On December 3, 2013, defendant’s mother telephoned the Public Defender’s Office to enlist their services after defendant was taken into custody on the instant charge. Stubbe’s testimony further established that First Assistant Public Defender Roger Brazil interviewed defendant’s mother by telephone and found the defendant financially eligible. Some time after 4:00 p.m. that day Brazil assigned Stubbe to represent defendant. At 4:20 p.m. Stubbe, based upon information and belief that defendant was in the custody of the Rochester Police Department (RPD), contacted Investigator Gary Galetta by telephone, advised that he was defendant’s attorney, and requested that defendant not be questioned. Stubbe also testified that he faxed a letter of representation to the RPD at 4:21 p.m. The letter itself, which was received at the hearing as de *796 fendant’s exhibit C, indicates on its face that it was successfully faxed at 4:21 p.m. The letter does not state that Stubbe represents defendant on any particular charge. Rather, it requests, in substance, that the police refrain from engaging defendant in any discussion about information he may have on the criminal activity of others without Stubbe’s written consent.
Defendant’s mother’s testimony revealed, in pertinent part, that on December 3, 2013, upon learning of defendant’s arrest, she contacted the Public Defender’s Office at or between 2:30 p.m. and 3:00 p.m. for an attorney to represent the defendant. She spoke to a secretary and relayed to the secretary the circumstances of defendant’s arrest. She provided the secretary defendant’s name and date of birth, as well as her name and telephone number. The secretary called her back within one hour and stated that Josh Stubbe would be defendant’s attorney. Defendant’s mother further testified that none of her telephone discussions with agents of the Public Defender’s Office included inquiry regarding her financial status. She testified that she believes Stubbe called her back that afternoon, introduced himself and stated that he was looking into defendant’s status.
The People called two rebuttal witnesses. Their first rebuttal witness was Kim Cammilleri, secretary to Monroe County Court Judge Victoria Argento. Cammilleri testified, in pertinent part, that she has worked at the Hall of Justice as Judge Argento’s secretary since January 2011. Her job duties include keeping Judge Argento’s schedule regarding court-related matters and keeping track of the judge’s files. In December of 2013 Judge Argento was the “Part 1” judge. Cammilleri testified that the Part 1 judge’s responsibilities, among other things, include requests from the Public Defender’s Office to be assigned as counsel. Although there are no regulations or protocol for handling Part 1 matters, Judge Argento has procedures in place for disposing of assigned counsel requests. Such procedures include requiring that assignment requests be submitted in writing and that anything provided in writing to chambers is maintained there. Assignment requests, Cammilleri testified, usually come by email from an attorney with an order requesting assignment attached to the email. Judge Argento also requires that any proposed order of assignment of counsel be accompanied by a supporting affirmation.
Cammilleri testified that she was working in her capacity as Judge Argento’s secretary on December 3, 2013 when she received a telephone call from Brazil at approximately 4:00 p.m. *797 seeking to have the Public Defender’s Office assigned to defendant’s case. Cammilleri advised Brazil to forward an order for Judge Argento’s consideration and signature. With respect to defendant’s financial eligibility, Cammilleri testified that Brazil told her that defendant’s mother had called the Public Defender’s Office and that she assumed, based on Brazil’s call to chambers, that the eligibility criteria was met. Judge Argento was on the bench when Brazil called. Brazil informed Cammilleri that defendant had been arrested, so in accordance with Judge Argento’s Part 1 assignment procedures, Cammilleri did not consider the requested assignment an immediate priority. Cammilleri testified that she never indicated during her telephone discussion with Brazil that the Public Defender’s Office was assigned. Additionally, Cammilleri testified that she never tells attorneys they are assigned without first speaking to Judge Argento.
Brazil sent an email to Cammilleri at 4:21 p.m. with an assignment order attached to it, but no accompanying affirmation. Cammilleri opened the email at 4:40 p.m., or so, around the time Judge Argento returned to chambers from the bench. Cammilleri presented the order to Judge Argento at that time for the judge to review. As no affirmation was attached, Judge Argento told Cammilleri to email Brazil to tell him that she would honor the assignment request upon receipt of a supporting affirmation. Cammilleri sent the email fulfilling the directive at 4:54 p.m. The email was received at the hearing as People’s exhibit 12. Around 5:00 p.m., Cammilleri and Judge Argento left chambers for the day.
The following day, December 4, 2013, Cammilleri retrieved a voicemail from Brazil, which Brazil left on December 3, 2013 at 5:02 p.m. Brazil’s voicemail indicated, in substance, that he was following up on whether Judge Argento had signed the order he had previously provided. Cammilleri testified that officers from the Rochester Police Department subsequently came to Judge Argento’s chambers to record Brazil’s voicemail. The voicemail was received at the hearing as People’s exhibit 13.
Judge Argento testified, in pertinent part, that she has been a Monroe County Court Judge since January 1, 2011. Part of her duties include acting as a Part 1 judge, which entails impaneling grand juries and resolving any grand jury-related issue, hearing search warrant applications, bail applications, and sometimes appointing counsel. In December of 2013, Judge Argento was the assigned Part 1 judge. She testified that one of *798 Cammilleri’s responsibilities as her secretary is to take requests from attorneys seeking assignment as counsel. Cammilleri is not authorized to assign counsel, however. Judge Argento requires Cammilleri to advise the attorneys requesting assignment that any proposed order of assignment be accompanied by a supporting affirmation for her (Judge Argento’s) review.
On December 3, 2013, Judge Argento descended from the bench at about 4:30 p.m. and returned to chambers. RPD Investigator John Brennan was there to submit a search warrant application for Judge Argento’s review in her Part 1 capacity. Shortly after returning to chambers, Cammilleri apprised Judge Argento of Brazil’s proposed order requesting that the Public Defender’s Office be assigned to represent the defendant. Simultaneously, Investigator Brennan entered her chambers and asked Judge Argento whether she had assigned an attorney to represent the defendant. Cammilleri handed the proposed order to Judge Argento, however there was no supporting affirmation. Judge Argento, based on her chambers protocol, directed Cammilleri to email Brazil to advise that an affirmation would be required for her (Judge Argento) to consider the order. Judge Argento testified that to her knowledge Brazil never followed up in providing a supporting affirmation, and thus, she never signed the proposed order. Judge Argento further testified that other than the above question posed to her by Investigator Brennan, they otherwise never discussed the case. Nor, based on Judge Argento’s testimony, did Investigator Brennan in any way exert or attempt to exert any undue or other influence on her in an effort to keep her from assigning counsel for the defendant.
Conclusions of Law
A confession or admission is admissible at trial only if its voluntariness is established beyond a reasonable doubt (see People v Guilford, 21 NY3d 205 [2013]; People v Yarter, 41 NY2d 830 [1977]; People v Valerius, 31 NY2d 51 [1972]). Miranda warnings are required when a person is subjected to custodial interrogation (see Miranda v Arizona, 384 US 436 [1966]; People v Berg, 92 NY2d 701, 704 [1999]). Whether a suspect is in custody is generally a question of fact (see People v Centono, 76 NY2d 837 [1990]), and “[t]he determination of [the] suppression court [on this issue] must be accorded great weight because of its ability to observe and assess the credibility of the witnesses” (People v Kelley, 91 AD3d 1318, 1318 [4th Dept 2012], lv denied *799 19 NY3d 963 [2012] [citation and internal quotation marks omitted]). The well settled standard to be applied is whether a reasonable person, innocent of any crime, would have believed he was not free to leave (see People v Yukl, 25 NY2d 585 [1969], cert denied 400 US 851 [1970]; Kelley, 91 AD3d at 1318, citing id.).
Even where the suspect validly waives his Miranda rights and voluntarily confesses to the police, the interrogation may be interrupted by the attachment of the suspect’s right to counsel. As pronounced by the United States Supreme Court, every defendant in a criminal proceeding shall enjoy the right to have the assistance of counsel (Gideon v Wainwright, 372 US 335 [1963]; see also Argersinger v Hamlin, 407 US 25 [1972]; Scott v Illinois, 440 US 367 [1979]). Accordingly, article 18-B of the County Law requires that each county have a plan in place for providing counsel to indigent defendants (see County Law § 722). Part and parcel of this plan, “[t]he public defender shall represent, without charge, at the request of the defendant, or by order of the court with the consent of the defendant, each indigent defendant who is charged with a crime” (County Law § 717 [1]).
In New York, the right to counsel also includes the “indelible” right to counsel. “The indelible right to counsel arises from the provision of the State Constitution that guarantees due process of law, the right to effective assistance of counsel and the privilege against compulsory self-incrimination” (People v Grice, 100 NY2d 318, 320 [2003] [citations omitted]), and “extends well beyond the right to counsel afforded by the Sixth Amendment of the United States Constitution and other State Constitutions” (People v Davis, 75 NY2d 517, 521 [1990]). The right to counsel indelibly attaches, among other ways, when an attorney “enters” a case on behalf of a suspect under investigation (see People v Lopez, 16 NY3d 375, 380 [2011]; People v Grice, 100 NY2d 318, 321 [2003]; People v Garofolo, 46 NY2d 592 [1979]; People v Arthur, 22 NY2d 325 [1968]). The Court of Appeals has long held that “ ‘entry’ is premised on the actual appearance or communication by an attorney” (Grice, 100 NY2d at 322 [and cases cited therein] [emphasis added]). Because the right to counsel is personal to the accused (see People v Bing, 76 NY2d 331, 350 [1990]), it cannot be invoked by “a relative or friend of the suspect, or some other third party” (Grice, 100 NY2d at 324; see also People v McCray, 121 AD3d 1549 [4th Dept 2014] [holding same]). An attorney’s telephone call to the *800 police constitutes a sufficient communication by an attorney “to establish [the attorney’s] entry into a case, at which point the police are required to cease all questioning” (Grice, 100 NY2d at 321, citing People v Gunner, 15 NY2d 226, 231-232 [1965]).
Additionally, the indelible right to counsel is not dependent upon the existence of a formal retainer agreement (see Grice, 100 NY2d at 322, citing Arthur, 22 NY2d at 329). Nor is its application dependent upon whether counsel is retained by the defendant or the defendant’s family (see People v Garofolo, 46 NY2d 592 [1979]; People v Pinzon, 44 NY2d 458 [1978]; People v Donovan, 13 NY2d 148 [1963]; see also People v Anderson, 233 AD2d 900, 900 [4th Dept 1996] [defendant’s statement was not obtained in violation of his right to counsel where neither “defendant (n)or anyone on his behalf requested that the Public Defender . . . assist() . . . (him)” (emphasis added)]).
In the interest of “achieving a balance between . . . the protection of cherished individual rights, on the one hand, and . . . effective law enforcement and [the] investigation of crime, on the other,” the bright-line rule which has been reaffirmed by the Court of Appeals is that “an attorney ‘enters’ a criminal matter and triggers the indelible right to counsel when the attorney or a professional associate of the attorney notifies the police that the suspect is represented by counsel” (Grice, 100 NY2d at 322-324). Any police interrogation post “entry” or attachment of the indelible right to counsel is prohibited unless defendant thereafter affirmatively waives the right in the presence of the attorney who entered the case on his behalf (see People v Hobson, 39 NY2d 479 [1976]). A confession or admission obtained in violation of a suspect’s indelible right to counsel must be suppressed {id.).
There is no real dispute in this case, nor do the parties argue otherwise, that defendant was ultimately subjected to custodial interrogation, and that the statements sought to be introduced at trial are the product of that interrogation. Based on the testimony adduced at the hearing and the court’s review of the audiovisual recording of the defendant’s interview in evidence (People’s exhibit 10), the court finds that defendant was adequately advised of his Miranda rights, affirmatively indicated that he understood those rights, and expressly waived them. Nor did the defendant appear to be sick, injured or otherwise impaired to any extent as to render the rights advisement or subsequent waiver involuntary in any way. Defendant’s waiver was knowing, voluntary and intelligent.
*801 The principal issues here are, one, whether defendant’s indelible right to counsel attached when Stubbe contacted the police, asserted that he was defendant’s attorney and directed police to stop questioning him; two, assuming defendant’s indelible right attached, whether his subsequent waiver was valid; and, three, whether a judge’s order assigning the Public Defender is a necessary prerequisite to authorize his entry as counsel.
Defendant contends that Stubbe’s telephone call to Investigator Galetta in which Stubbe asserted that he was defendant’s attorney and to stop questioning him triggered the attachment of his indelible right to counsel. Thus, says defendant, any statements he made following that triggering event, all such statements having been made absent an express waiver in Stubbe’s presence, are inadmissible at trial. Defendant argues that a judge’s order assigning the Public Defender is not a necessary prerequisite to the Public Defender’s entry into the case on his behalf. Such “mechanical” requirements, he contends, cannot forestall the indelible attachment of counsel. In defendant’s view, that he was deemed eligible for representation by the Public Defender’s Office as a result of his mother’s enlistment of their service sufficed to warrant Stubbe’s entry in his defense, notwithstanding the absence of a judge’s order of appointment.
The People disagree. They do not contend that the general rule regarding “entry” and the triggering event here as related to the indelible right to counsel is other than defendant states. Rather, they argue that Stubbe (the Public Defender’s Office) was not, in fact, defendant’s attorney when he contacted Investigator Galetta and stated he was. The testimony of defendant’s mother, say the People, made clear that no one in the Public Defender’s Office verified defendant’s eligibility. The People contend, in addition, that the Public Defender’s Office was without authority to act as defendant’s counsel absent an order signed by a judge appointing the Public Defender. As no such order was signed at the time Stubbe made the call to Investigator Galetta, the People maintain that Stubbe was not defendant’s attorney, and thus, defendant’s indelible right to counsel never attached. In any event, say the People, under New York law the right to counsel is personal to the accused, and even assuming arguendo that defendant’s indelible right to counsel did attach, his rejection of Stubbe as counsel, under the circumstances presented, constituted a proper waiver. The People conclude accordingly that all of the defendant’s statements are admissible at trial.
*802 The court finds that while defendant’s Miranda waiver at the PSB was knowing, voluntary and intelligent, his indelible right to counsel attached at 4:20 p.m. on December 3, 2013 when Stubbe contacted Investigator Galetta by telephone and stated that he was defendant’s attorney and to stop all questioning. The court finds that the Public Defender’s Office thereby “entered” the case on defendant’s behalf, and all questioning should have then ceased. While, to be clear, neither the officers nor any prosecutor involved in defendant’s interrogation engaged in any “pattern of isolation and trickery designed to keep the defendant from obtaining counsel” (People v Platten, 175 AD2d 561, 561-562 [4th Dept 1991] [citations omitted]), defendant’s rejection of counsel as depicted in his interview was ineffective, for once the indelible right to counsel attaches, further interrogation is prohibited unless thereafter, in the presence of counsel, defendant forfeits his right to counsel. Such was not the case here.
The court will first address the People’s argument that the Public Defender must be assigned by order of the court before he could act as counsel for a suspect or defendant. That argument, within the context of a defendant’s financial eligibility determination, finds support in both statutory and case law (see e.g. County Law § 722; CPL 170.10 [3] [c] [court required to appoint counsel at arraignment before proceeding if defendant is financially unable to retain same]; 180.10 [3] [c]; [5] [same]; 210.15 [2] [c] [same]; Hurrell-Harring v State of New York, 15 NY3d 8, 20-21 [2010] [same]; see also People v Linares, 2 NY3d 507, 510 [2004] [it is the court’s responsibility to assign counsel] [citation omitted]; People v Spahalski, 12 Misc 3d 1198[A], 2006 NY Slip Op 51622[U], *11 [Monroe County Ct 2006, Marks, J.] [indelible right to counsel did not attach where “(t)here (was) no evidence that the court assigned the Public Defender’s Office to the case”]; Powell v Alabama, 287 US 45, 72-73 [1932] [eligibility determination rests with the court]; People v Ward, 199 AD2d 683, 684 [3d Dept 1993] [same], citing Matter of Stream v Beisheim, 34 AD2d 329, 333 [2d Dept 1970]; People v King, 41 Misc 3d 1237[A], 2013 NY Slip Op 52047[U] [Bethlehem Just Ct 2013] [same]; People v Wheat, 80 Misc 2d 844 [Suffolk County Ct 1975] [same]).[5]
While the above authorities support the proposition that an indigent defendant’s eligibility determination rests with the *803 court, they do not support the broader proposition espoused by the People that the Public Defender is powerless to act unless and until appointed by order of the court. To the extent that Spahalski, though factually distinguishable from this case, may generally support that proposition, this court respectfully declines to follow it for the reasons expressed herein.
Effective assistance of counsel for indigent individuals demands the absence of suspect distinctions regarding the obtainment of counsel. Indeed, the American Bar Association (ABA) recommends that counsel be provided as soon as practicably possible after someone is taken into custody (see ABA Standards for Criminal Justice, Providing Defense Services, standard 5-6.1 [3d ed 1992], available at http:// www.americanbar.org/publications/criminaljustice_section_ archive/crimjust_standards_defsvcs_blk.html). Similarly, the New York State Bar Association (NYSBA) recommends that indigent individuals be afforded “early entry of representation” whenever counsel is requested for an indigent party under investigation or in custody (see NYSBA Revised Standards for Providing Mandated Representation, standard B-l at 5 [2010], available at https://www.ils.ny.gov/files/Revised%20Standards %20For%20Providing%20Mandated%20Representation.pdf). While the NYSBA states that the initial eligibility determinations shall be decided by the court (see id. standard C-3 at 6), they also declare that the “[provision of counsel shall not be delayed while a person’s eligibility ... is being determined or verified” (id. standard C-5 at 6). These standards, applicable to all attorneys tasked with representing indigent individuals, demonstrate, objectively, that effective representation for indigent individuals entails representation without delay pending the judge’s eligibility determination. The court is not maintaining that a judge’s order of appointment is without purpose or a practice that should be dispensed with. The court is simply saying that there is no scenario under which indigent individuáis would not be afforded an impaired quality of repre *804 sentation where the Public Defender’s function as counsel is effectively disabled pending receipt of a judge’s order of appointment. An overtechnical application of this measure, as urged by the People, would sanction the sort of “mechanical” requirement eschewed by the Court of Appeals in Grice, in subversion of the right to counsel (see Grice, 100 NY2d at 323).
Nor does the utility of an on-call judge remedy the potential mishap. The time it may take counsel for the Public Defender’s Office to reach the on-call judge and then fax an order for the judge’s review and signature—whether 5 minutes, 15 minutes, an hour, or longer—may be fatal to the suspect’s or defendant’s defense, depending on if and when an incriminating admission is made in the interim. Under circumstances tantamount to those here, the impracticality of this procedure becomes apparent (see id. [the right to counsel, once it attaches, cannot be undermined by impractical rules]).[6]
Consider, further, by way of example, the potential disparate impact as to both effective representation and the application of the rule at stake. Defendants A and B are suspected as co-defendants in a homicide, arrested and taken into custody simultaneously on Friday afternoon at 2:00 p.m. Defendant A’s family has the resources to retain counsel. Defendant B’s family does not. At 3:00 p.m., A’s family enlists the services of a private attorney. The private attorney contacts the police department at 3:05 p.m., confirms her client is in custody and respectfully demands that all questioning cease. Likewise, at 3:00 p.m. B’s family contacts the Public Defender’s Office, and an agent or attorney from that office deems B, who is less than 21 years old, eligible for their services. B’s attorney also contacts the police department at 3:05 p.m., confirms his client is in custody and respectfully demands that all questioning cease. No doubt that in both cases, the attorneys’ actions constitute “entry.” The police, that being so, honor private counsel’s entry and refrain from any further questioning of A. They take a different tact with B, however. They inquire with B whether he knows the assistant public defender (APD) who has undertaken to enter the *805 case on his behalf and whether B wants him as an attorney.[7] B states that he does not know the APD and declines on the basis that he wants to continue talking to the police. At some point thereafter B admits to the homicide without defense. A, while equally culpable, as a result of the indelible attachment of counsel, makes no admission. The only bona fide distinction between these two hypothetical defendants is that A is represented by private counsel and B by the Public Defender. That the APD’s entry would be deemed ineffective without a judge’s order of appointment is a poignant irony—for the APD did exactly what effective counsel ought to in the above circumstances. Yet, his entry being deemed ineffective absent a court order of appointment impinged upon the indigent suspect’s constitutional right to counsel, while defendant A, represented by private counsel free to do her job without the judge’s approval, is protected.
Extrapolating from this hypothetical, why should attorney Otis’s telephone call to the Suffolk County Police Headquarters in Pinzon, or attorney Naiburg’s telephone call to Detective Joyce at police headquarters in Garofolo, suffice to indelibly attach Pinzon’s and Garofolo’s right to counsel, but Stubbe’s telephone call to Investigator Galetta not suffice to attach defendant’s right to counsel here? Whether counsel is retained or assigned is immaterial; the indelible right to counsel is not dependent on the existence of a formal retainer agreement (see Grice, 100 NY2d at 322). Moreover, it can hardly be seriously maintained that the context within which the Court of Appeals jurisprudence on this issue mentions that the attorneys in those cases were retained somehow implies, insinuates, or should be otherwise construed to mean that the indelible right to counsel does not apply equally to all or that its application may be subject to qualification or nice distinctions balanced on the particulars of the attorney-client relationship. Courts are not interested in whether counsel is retained, per se; courts are interested, solely, in whether counsel has been secured. In that respect, as far as the courts or judges ought to be concerned, to “retain” means to “secure.” Indigent parties secure counsel through the interview process with the Public Defender’s Office. There is no dispute that a parent may retain an attorney for a child or loved one in custody, and the attorney’s telephonic *806 entry thereafter triggers the indelible attachment of counsel (see generally Garofolo, 46 NY2d 592; Pinzon, 44 NY2d 458; Donovan, 13 NY2d 148). By extension, here, defendant’s mother, through seeking the services of and interviewing with the Public Defender’s Office, secured an attorney for defendant. That Stubbe is an APD rather than a private attorney is a distinction without a difference, under the facts presented, and his telephonic entry, following a preliminary eligibility determination, and notwithstanding the absence of a court order of appointment, sufficed, in this court’s view, to indelibly attach defendant’s right to counsel.[8]
The People’s comparison of Pinzon and Garofolo to the instant case in support of their contention that defendant waived his indelible right to counsel is faulty. The People argue that it is simply not the law in New York that the police must stop all questioning once the indelible right attaches, absent an express waiver in counsel’s presence. Defendants Pinzón and Garofolo, say the People, were kept in the dark regarding their respective counsels’ entry on their behalf, whereas here, the police properly informed defendant of Stubbe’s entry and the defendant nevertheless rejected his service. This argument, albeit persuasive on its face, is misplaced, for it imports the Court of Appeals’ reasoning in Bing, decided in 1990, to cases decided more than 10 years earlier, and long before the Court of Appeals saw fit to remedy the failings of its “derivative right” rule originated in People v Bartolomeo (53 NY2d 225 [1981], overruled by Bing), which arose in an entirely different context than present here. *807 If the Court of Appeals intended for its holding in Bing to change the indelible right to counsel rule in this State, then they would have expressly stated so. They did not. Rather, the Court of Appeals in Bing expressly reaffirmed its holding in People v Rogers (48 NY2d 167, 173 [1979]), decided the same vintage as Pinzon and Garofolo, which holds that the indelible right to counsel, once attached, cannot be waived absent an express waiver in the presence of counsel (see Rogers, 48 NY2d at 173). The court also notes that Garofolo and Pinzon stand for the proposition that when a family member enlists counsel for a defendant in custody, counsel’s telephonic entry to the police thereafter indelibly attaches a defendant’s or suspect’s right to counsel. While the facts in Garofolo and Pinzon involved dubious police tactics not present here, the question of whether the defendants in those cases would have accepted or rejected the attorneys enlisted by their families was not addressed. The very fact that Pinzón and Garofolo were oblivious to counsels’ entry on their behalf and the Court of Appeals held, nevertheless, that their respective rights to counsel indelibly attached demonstrates that the defendant’s knowledge of an attorney’s entry is inapposite to the analysis, as further explained below.
As noted by the People, the Second Department has qualified the circumstances under which the indelible right to counsel applies (see People v Lennon, 243 AD2d 495, 496 [2d Dept 1997] [declining to extend it where defendant, who spoke disparagingly of counsel who entered the case on her behalf, stated that “if she needed a lawyer to represent her ... it would not be him”]; but cf. People v Borukhova, 89 AD3d 194, 216 [2d Dept 2011], lv denied 18 NY3d 881 [2012] [applying the indelible right to counsel to an entry by telephone case where “(i)n marked contrast to Lennon . . . the defendant merely stated that she had not called an attorney, and did not know (the attorney)”]). In consideration of the Second Department’s rationale in Lennon, this court respectfully declines to engraft any such added criteria into the indelible right to counsel. The indelible right to counsel cannot be parsed in disregard of any of its essential ingredients the most indispensable of which perhaps is that once it attaches it cannot be waived without the presence of counsel. Intrinsic to the rationale behind the indelible right to counsel is the need to protect the unwary suspect or defendant under the crucible of custodial interrogation and confronted with the awesome power of the government. To permit the police, in such circumstances, to seek the suspect’s *808 or defendant’s approval of counsel who entered the case enfeebles, if not altogether vanquishes, the counseled waiver element of the rule and opens the door for uncounseled waivers without counsel’s presence where entry has doubtless occurred. Such encroachments serve only to adulterate the rule and infuse it with malleability inimical to its core. As the Court of Appeals stated in Hobson,
“[t]he rule that once a lawyer has entered the proceedings in connection with the charges under investigation, a person in custody may validly waive the assistance of counsel only in the presence of a lawyer breathes life into the requirement that a waiver of a constitutional right must be competent, intelligent and voluntary . . . Indeed, it may be said that a right too easily waived is no right at all” (Hobson, 39 NY2d at 484 [citations omitted]).
The rule defining the indelible right to counsel includes on its face the sole way the right may be unattached—without further exception.
Furthermore, inasmuch as Lennon’s appeal was dismissed by the Court of Appeals (91 NY2d 942 [1998]),[9] it is distinguishable from the facts here, which are more analogous to Borukhova. That is, defendant here, unlike in Lennon, did not repudiate the prospect of being represented by the Public Defender’s Office, but meekly declined. If distinctions are to be drawn in accord with the Second Department’s rationale, defendant’s reaction here is much more akin to Borukhova’s, thereby preserv *809 ing his indelible right to counsel. In any event, the Court of Appeals jurisprudence on this issue says nothing of the indelible right to counsel hinging on the suspect or defendant’s approval or past relationship with the attorney who enters the case.
The Second Department’s qualification in Lennon, albeit cogent, nevertheless runs counter to an indispensable corollary to the indelible right as pronounced by the Court of Appeals in Arthur that “[t]here is no requirement that the attorney or the defendant request the police to respect this right of the defendant” (Arthur, 22 NY2d at 329; Hobson, 39 NY2d at 483, quoting id.), a rule which, as noted by the Court of Appeals in Hobson, “has been restated many times” (id. [citations omitted]). As one commentator has noted,
“there is simply no logic in a jurisprudence that would hold the right to counsel indelibly attached when a defendant is not informed about an attorney’s phone call [see e.g. Donovan, 13 NY2d 148], yet perfectly waivable if he is [see e.g. Lennon, 243 AD2d 495 (implying this); People v Taylor, 2002 NY Slip Op 50096(U) (Sup Ct, Queens County 2002) (same)]; it is pedagogically problematic to say that the defendant’s right attaches only if police keep him in the dark. . . . [T]he police’s decision to hold a defendant incommunicado cannot define whether the defendant’s right to counsel attaches” (Adrienne Levy, Note, Beyond Bing: The Arthur Rule Lives on as the Touchstone for the New York State Right to Counsel, 35 Cardozo L Rev 831, 860 [2013]).
Significantly, the Court of Appeals, in treating this very issue, has made plain that “[o]nce an attorney has appeared on the defendant’s behalf . . . the police [are prohibited from] . . . rely[ing] on arguable ambiguities in the attorney-client relationship in order to justify . . . questioning . . . the defendant without the attorney being present” (People v Marrero, 51 NY2d 56, 59 [1980] [citation omitted]). Put simply, “if the police are uncertain as to the scope of the attorney’s representation, the defendant should not be questioned” (id. [citation omitted]).[10] While the record doubtless reveals that the police exercised *810 their duties in good faith in every respect throughout the interview process, the above rules, notwithstanding the tottering history of the indelible right to counsel jurisprudence in this State, remain good law and evince that the defendant’s purported waiver of his right to counsel following Stubbe’s entry into the case was invalid. Under the circumstances, defendant’s indelible right to counsel was never detached.
This court respectfully declines to find what any contrary decision here could imply, namely, that the degree to which an accused person enjoys the indelible right to counsel in this State is at all ultimately proportionate to the suspect or accused’s resources or hinges in any manner on arbitrary factors such as socioeconomic class.[11] The indelible “right,” to merit that title, must be universal and unqualified, and in no way fettered by an individual’s socioeconomic class or ability to retain private counsel, nor is this court willing to mark itself the vanguard for drawing any such suspect distinction or framing an opinion with that net effect in derogation of one of the most “cherished and valuable [state constitutional] protection^] that must be guarded with the utmost vigilance” (Lopez, 16 NY3d at 380 [citation omitted]; see NY Const, art I, § 6). To hold that the Public Defender, notwithstanding his preliminary eligibility determination, cannot promptly act in defense of his clients until a judge signs an order appointing him as counsel would reduce the indelible right to counsel to nothing more than a quixotic ideal to be dangled before the poor, who not only constitute the vast majority of the accused in our criminal justice system but whose lawyers would be impotent to act in their defense, unless *811 and until permitted to do so by order of the court. This would be nothing short of regrettable in a criminal justice system which prides itself on championing the rights of the accused, and due process and equal protection of the law. Requiring such a condition precedent to the performance of the Public Defender’s duties, specifically where, as here, the defendant’s family affirmatively sought the assistance of the Public Defender, and an attorney from that office, after interviewing the defendant’s mother, found the defendant eligible, would render the indelible right to counsel, for the underprivileged, a mere legal fiction more apropos of the indelible “privilege” to counsel.
To be clear, this court readily recognizes and in no way seeks to supplant the well settled existing law that the final determination of indigency is reserved for the judge. In reconciling that rule with the customary practice of submitting an order of appointment, the highly regarded standards for effective representation of indigent individuals promulgated by the ABA and NYSBA, and the immeasurable importance of safeguarding the constitutional right to counsel, this court holds that the Public Defender, following a preliminary eligibility determination for a witn’ess, suspect, or defendant, must have unconstrained liberty to act swiftly in defense of his clients, no different than attorneys in the private sector.
For the foregoing reasons, any statements made by the defendant after Stubbe entered the case on his behalf on December 3, 2013 at 4:20 p.m. are hereby suppressed. Accordingly, that branch of defendant’s omnibus motion seeking suppression of statements is granted in part and denied in part.

. The veracity of Investigator Giudici’s testimony was additionally borne out by the audiovisual recording of the interview (People’s exhibit 10). Additionally, the factual portion of this opinion which bears on Investigator Giudici’s testimony also includes pertinent information included in People’s exhibit 10.

. Although Investigator Giudici testified that the defendant entered the interview room shortly after 10:00 a.m., and ultimately exited the interview for processing and transport to booking some time after 7:00 p.m., the duration of time the defendant was actually subjected to questioning was significantly less than nine hours.

. All such times hereinafter are in reference to the time depicted on the interview monitor in People’s exhibit 10.

. The nature or specifics of the “additional information” was not altogether developed clearly at the hearing.

. Notably, this court has not found any New York authority that squarely addresses the narrow issue of whether the Public Defender’s ability to intercede on behalf of an otherwise qualified defendant must be deferred *803 pending approval and appointment by court order. In looking to other states for guidance, the authorities do not quite coalesce (see e.g. State ex rel. O’Brien v Ely, 718 SW2d 177, 181 [Mo Ct App WD 1986] [public defender, not the courts, is vested with the exclusive authority to determine eligibility]; State v Weaver, 38 Ohio St 3d 160, 161 [1988] [indigency determination is made by the public defender, subject to the court’s review]; Office of Public Defender v State, 413 Md 411, 432 [2010] [same]; Matter of Subpoena Duces Tecum on Custodian of Records, 214 NJ 147, 159 n 1 [2013] [judiciary makes the indigency determination]).

. The People contend that there is nothing mechanical about the requirement of a court order of appointment. This opinion does not stand for the proposition that such orders are not integral and important to the process, but only that pending consummation of the order the Public Defender must not be restricted in the performance of his duties.

. The issue regarding the propriety of law enforcement “verification” into the veracity of the attorney-client relationship is addressed in detail later in this opinion (see infra at 806-811).

. The court finds, contrary to the People’s contention, that the record, albeit not resoundingly, sufficiently establishes that the Public Defender’s Office verified defendant’s financial eligibility. Specifically, the court credits Stubbe’s hearsay testimony that Brazil fielded defendant’s mother’s telephone call seeking counsel for defendant on the instant charge and the defendant was deemed eligible. This testimony, in sum and substance, was elicited on both direct and cross-examination as well as in response to questions posed by the court. The court does not discount that the defendant’s mother’s testimony yielded that she never discussed her financial status with any member of the Public Defender’s Office and that the only time she talked to an attorney on December 3, 2013 was when Stubbe called her to introduce himself and advise that he was going to look into defendant’s status. Such testimony was not elicited in a vacuum, however, and must be assessed in light of all the relevant factors, to include People’s exhibit 13 in evidence, the pertinent contents of which contain a voicemail from Brazil to Judge Argento’s chambers in which Brazil states, in substance, that he is calling to follow up on an order that he faxed to Judge Argento’s chambers requesting that the Public Defender’s Office be assigned to represent the defendant. This proof, in conjunction with the other credible evidence, adds an anchor of reliability to and corroborates Stubbe’s testimony probative of the basis of defendant’s eligibility.

. It is important to note that the Court of Appeals’ jurisprudence regarding the indelible right to counsel, dating back to the early 1960s (see e.g. Donovan [1963]) has had somewhat of a tortured history. As stated by Judge Graffeo in the majority opinion in Lopez (16 NY3d at 385), “[t]he path we have taken in right to counsel cases may have been bumpy at times.” While the Second Department in Lennon endeavors to vindicate its qualified application of the indelible right to counsel on the basis of Bing’s dicta that the right to counsel is personal to the accused, Bing was decided within the context of cases where entry by an attorney never occurred and the right to counsel was predicated on prior representation on unrelated matters. The Bing court, finding that this “derivative right,” first recognized in People v Bartolomeo (53 NY2d 225 [1981]), is “not firmly grounded on prior case law, cannot be applied uniformly, favors recidivists over first-time arrestees, and exacts such a heavy cost from the public,” overruled Bartolomeo (Bing, 76 NY2d at 350), and thus, the “derivative right” to counsel. Surely not in vain, however, the Bing court explicitly reaffirmed its holding in People v Rogers (48 NY2d at 173) that once an attorney enters the case, further police questioning of the defendant is prohibited, nor may the defendant waive the right to counsel, except in counsel’s presence (see Bing, 76 NY2d at 350; Rogers, 48 NY2d at 173).

. Nor does the Court of Appeals’ more recent decision in People v Pacquette (17 NY3d 87 [2011]) vitiate these long-standing principles. Notably, in Pacquette, markedly different from the instant case, the attorney, assigned to represent defendant on preexisting unrelated drug charges, explicitly acknowledged that he was not assigned to represent the defendant on the homicide matter under investigation and never told the investigating detectives otherwise (see 17 NY3d at 91-95). Squarely within that context the Pacquette *810 Court held that “an attorney may [not] unilaterally create an attorney-client relationship in a criminal proceeding in this fashion” (id. at 95 [emphasis added]). The Court of Appeals, were it to have decided Pacquette in the defendant’s favor, would have essentially resurrected the “derivative right” previously overruled in Bartolomeo, by sanctioning the attachment of counsel on a new charge based solely on counsel’s representation on unrelated charges, where counsel’s “entry” on the new charge had plainly not been sufficiently communicated to the police. Here, in stark contrast, Stubbe sufficiently communicated his representation directly to the police after Brazil assigned him defendant’s case.

. Nor is the court at all insinuating that the People are espousing any such position. The court is simply making explicit what, absent this peculiar set of facts, may otherwise never have come to fruition, i.e., that the net effect of forestalling or deferring the Public Defender’s action, to any extent, in defense of his clients until he is appointed by the court invites circumstances the potential, albeit unintended, consequence(s) of which could lead to indigent defendants being deprived of the opportunity to receive the same quality of representation their non-indigent counterparts may be provided by private attorneys free to act swiftly in defense of their clients.